## Stein Bros. & Boyce v. State Bank of Stearns.

(Decided June 22, 1934.)

GORDON, LAURENT & OGDEN for appellants.

NORMAN, QUIRK & GRAHAM and TYE, SILER, GILLIS & SILER for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER — Reversing.

The State Bank of Stearns instituted this action in the Jefferson circuit court against Stein Bros. & Boyce, a firm who now is and has for many years been engaged in an investment banking and brokerage business in Louisville, seeking to recover for the alleged conversion of four bonds of the Shell Union Oil Corporation of a par value of $1,000 each.

Defendants denied the alleged conversion and pleaded certain affirmative defenses setting forth matters which will be shown in a statement of the facts. A reply controverting the affirmative matter in the answer completed the issues. Trial before a jury resulted in a verdict and judgment in favor of plaintiff for $3,485, and defendants are appealing.

Grounds relied on for reversal, in substance, are (1) that under the evidence the court should have instructed the jury to peremptorily find for defendants; (2) that the verdict is contrary to the evidence and that the jury clearly disregarded the instructions in making their verdict.

The facts as gleaned from the record are that for some years appellee had been buying bonds from appellants when it had surplus funds to invest. James W. Chandler was employed as an agent to sell bonds for appellants. He formerly attended college at Danville

where he became acquainted with John E. Butler, vice president of appellee bank. Some time in the early part of June, Mr. Chandler solicited Mr. Butler to buy some city of Brisbane bonds, recommending them as a good investment. Mr. Butler protested that the bank had no funds available for investment at the time, and, upon learning that the bank had some Shell Union bonds, Mr. Chandler advised him to sell them. The market value of the Shell Union bonds at the time was about $99⅜. There is no dispute about the facts up to this point in the transaction. Mr. Butler testified that Chandler first approached him in Somerset and advised the purchase of the city of Brisbane bonds, and later called on him at his office in Stearns, where they went over the proposition in the presence of Mr. Martin, the cashier of the bank. According to Mr. Butler's version of the transaction, appellants were authorized to buy the city of Brisbane bonds for the bank provided they first sold its Shell Union bonds at par. In this he was corroborated by Mr. Martin.

According to the evidence of Mr. Chandler Mr. Butler gave him separate and distinct orders respecting the bonds, (1) to purchase the city of Brisbane bonds at 96.5, less one-fourth of 1 per cent., a concession made to banks, and the other to sell for the bank its Shell Union bonds at par. Mr. Chandler testified that he talked with Mr. Butler concerning the transaction over the telephone from Louisville and did not see or talk with him concerning the matter at Stearns; that the conversation was had on June 6, 1930. On June 6 appellants wrote appellee the following letter:

"In connection with your negotiations with our Mr. James W. Chandler, we are pleased to confirm sale to you, when issued of $4,000 City of Brisbane Sinking Fund 6% Bonds Due 1950—at 96½ and interest, less a Banker's concession of ¼ of 1%.

"We have entered a selling order on the Shell Union Oil 5s and we will advise you if it is executed.

"We wish to thank you very much for this business."

The Shell Union bonds were sent to appellants from a bank in Cincinnati which was a depository of appellee, and, upon receipt of them, appellants forwarded to appellee the following letter acknowledging receipt of same.

"Enclosed you will find our receipt covering —$4,000 Shell Union Oil Corp. 5% Bonds due Oct. 1, 1949—With Warrants [Temporaries]—received this morning from the Fifth-Third Union Trust Company, Cincinnati.

"As per your instructions, we have order in to sell these bonds, the proceeds of which are to be applied on $4,000 City of Brisbane bonds.

"Thanking you very much, we are,"

In June, 1930, accountants employed to audit appellants' books caused notices to be sent to customers in order to verify accounts. The following notice was sent to appellee: .

"In connection with the periodical audit of our accounts, now being made by Davis, Perry & Company, Certified Public Accountants, 717 Title Building, Baltimore, Maryland, please confirm the following Open Trades with us at the close of business, June 30, 1930.

Long [On our books]      Short [On our books]

$4000.00 City of Brisbane 6s

1950 at 96½ less ¼

'Delayed Delivery'

"If the above statement is found correct, please sign and return in the enclosed envelope, or advise promptly if there is any discrepancy."

At the bottom of this letter, Mr. Martin, the cashier of the bank, wrote the word "Correct" and affixed his signature as cashier and returned the letter to appellants. It appears in evidence that appellants sent out semimonthly statements concerning orders to buy or sell securities, and that such notice was sent to appellee. One of these formal notices appearing in the record reads:

"Please note that in accordance with your instructions, we have entered the following orders for your account, Good Until Countermanded, which will have our attention and for which please accept our thanks. The entering of day orders, good until cancelled orders, or stop orders, does not cancel

previous orders, unless specific instructions to that effect are given.

"To buy

"To sell

"4M Shell Union 5, 49 at 100.

"Very truly yours,

"Stein Bros & Boyce.

"When stock sells ex dividend any orders to buy will be reduced the amount of the dividend, unless otherwise specified. Selling orders will not be changed."

The officers of the bank admit receiving a number of these statements.

On October 18, 1930, appellants forwarded to appellee a letter reading:

"Our Cashier Department is holding for your account—$4,000 City of Brisbane 6s due 1950.

"Sometime ago we entered an open order, good until executed or cancelled, to sell—

"$4,000 Shell Union Oil Company 5s due 1949 [With Warrants]—at 100 and interest. At the time you entered this order, these bonds were selling around this price, but your order was not executed, as the market did not reach your price. Since that time the bonds have declined in price, and they are now selling around 91, and the Brisbanes are now selling around 93. I thought perhaps you would desire to reduce your order on the Shell, or either sell the Brisbanes on the market. We are just bringing this to your attention as a matter of service, as we will be very glad to continue to keep the orders in, as they were originally placed.

"If you desire to make any changes, please communicate with us.

"Thanking you for your past favors, we are,"

Appellee did not reply to this or to any of the communications theretofore received from appellants except the letter of June 30 which the cashier certified to be correct and returned to appellants. Mr. Butler testified that after the letter of October 18 was written Mr. Chandler called to sell him some more bonds. He told him what the terms of the transaction were as he

understood them, took him to task for buying the city of Brisbane bonds before having sold the Shell Union bonds, and asked him why he did that; that Mr. Chandler replied, "I think if you will let it ride along it will work out all right." He further testified that he was not very much worried about the matter at the time and did not think there was anything dangerous in the proposition, and, "with that assurance, let it rock along."

The evidence shows that the market price of the bonds of the Shell Union and city of Brisbane held up pretty well for some time after the transaction, but the price of Shell Union never reached par. However, after the general break in the stock market, bonds of these issues declined rapidly in value. On September 18, 1931, appellants wrote appellee that the city of Brisbane bonds were selling around 43 and Shell Union at 67 and that it would be necessary that they have additional collateral to secure the purchase price of the former; that, unless the city of Brisbane bonds were taken up for cash or additional collateral was posted, a sale of these securities would be necessary, and gave appellee until September 21 to take up the city of Brisbane bonds or to deposit additional collateral.

Appellee replied by wire that, if appellants disposed of its Shell Union bonds, they would do so at their own risk. When the bonds were sold by appellants, the price received from all of them was but little more than the price at which the city of Brisbane bonds were purchased. It appears in evidence that appellants had subscribed for $25,000 of the city of Brisbane bonds when issued to sell to their customers. At the time of this transaction the bonds had not been issued, but were issued a few days thereafter. Appellants held the four city of Brisbane bonds for appellee, but did not transfer them on their books. They collected and retained the interest on them. The evidence shows that this was the usual custom followed by brokers until the bonds were paid for.

After giving instruction No. 1 which in effect authorized a finding for appellee if the jury believed from the evidence that the order to buy the city of Brisbane bonds was contingent upon the execution of the order to sell the Shell Union bonds and instruction No. 2 which authorized a finding for appellants unless they so believed, the court gave a further instruction reading:

"Although you may believe from the evidence 'as is set forth in Instruction No. 1, yet if you further believe from the evidence that the defendant, Stein Bros & Boyce, notified the plaintiff, State Bank of Stearns, of the purchase of said City of Brisbane bonds at 96½ before effecting a sale of the Shell Union Bonds at par, and that the plaintiff, after receiving said notice, failed within a reasonable time to disavow the act of the defendant in so doing, then the law is for the defendant, Stein Bros & Boyce, and you will so find."

Counsel for appellants maintain that the quoted instruction embodies a correct statement of the law of the case and that under the evidence the court should have directed a verdict for appellants.

Unquestionably there is ample evidence to sustain appellee's contention respecting the terms of the original agreement, and, if the case turned on that question alone, we would not under the prevailing rules be authorized to disturb the verdict of the jury. However, as will be seen from the foregoing statement of facts, a more serious problem is presented.

The question is whether, regardless of the terms of the contract, notice was brought to appellee that the city of Brisbane bonds had been purchased and were held for it before the Shell Union bonds had been sold and by its silence when it was required to speak or by its course of conduct as shown by the evidence it is precluded or estopped from denying liability growing out of the purchase of the bonds. In their letter of June 6, appellants confirmed the sale of the city of Brisbane bonds to appellee and notified appellee that the order to sell Shell Union bonds had been entered and that it would be advised if the order was executed. Not only so, but, in the letter of June 30, appellee was asked to and did confirm the accounts on appellants' books showing the purchase for it of the city of Brisbane bonds "delivery delayed." Furthermore the semimonthly statement sent out by them brought notice to appellee that the Shell Union Bonds had not been sold, but made no reference to any order to buy. Notwithstanding these letters, the receipt, and the semimonthly statements which were sufficient to bring notice to a reasonably prudent person as to the manner in which the transaction was being handled, no words of protest or

276

disavowal came from appellee. After Mr. Butler admits that he had actual notice that the city of Brisbane bonds had been purchased and were held on its account and he talked with Mr. Chandler concerning the matter, he did not repudiate or disavow appellants' acts, but testified in substance that he was not worried about the matter at the time and did not think there was anything dangerous in the proposition, but, with the assurance of appellants' agent that the matter would work out all right, "We let it rock along."

If appellants purchased the city of Brisbane bonds contrary to the agreement as appellee understood it and notice of that fact was brought to appellee, it was then its duty to make seasonable complaint and to disavow the transaction. One may not keep silent when in equity and good conscience he ought to speak and thereby cause others to be misled to their prejudice. Wabash Drilling Co. v. Ellis, 230 Ky. 769, 20 S. W. (2d) 1002; Skaggs v. Ferguson, 224 Ky. 775, 7 S. W. (2d) 213.

The conclusion is inescapable that notice was brought to appellee that the city of Brisbane bonds had been purchased for it and that the Shell Union bonds had not been sold and that it did not, within a reasonable time, disavow the act of appellants in so doing. In such circumstances the court should have directed a verdict for appellants.

For the reasons indicated, the judgment is reversed, and cause remanded for proceedings consistent with this opinion.

Whole court sitting.