**CHAMPLIN OIL & REFINING COMPANY et al., Petitioners,**

**v.**

**M. B. CHASTAIN et al., Respondents.**

**No. A–10293.**

Supreme Court of Texas.

Nov. 10, 1965.

On Rehearing May 11, 1966.

Cantey, Hanger, Gooch, Cravens & Scarborough, Cecil E. Munn, Fort Worth, for petitioners.

Jackson, Walker, Winstead, Cantwell & Miller, Dallas, for respondents.

NORVELL, Justice.

This is a suit to recover sums of money allegedly due under a gas processing con-

tract. Plaintiffs, M. B. Chastain and others, recovered judgment against defendants, Champlin Oil & Refining Company and others, for the sum of $118,076.25. The Court of Civil Appeals affirmed in the main but modified so as to permit recovery for only such sums as were not barred by the four-year statute of limitations. 379 S.W.2d 938.

### The Issues in the Case

■ While there are a few subsidiary problems, hereinafter mentioned, the two main issues before us relate to the petitioners' contentions that the Court of Civil Appeals erred (1) in holding that the trial court was correct in refusing to give petitioners' requested special issues designed to submit petitioners' theory that the contract sued upon should be reformed because of a mutual mistake, and (2) in holding that the trial court correctly disregarded the jury's answers to special issues designed to submit petitioners' theory that respondents should not be allowed to recover upon the contract as written because of an asserted equitable estoppel. As both these holdings were made as a matter of law, we are required to view the facts from the standpoint most favorable to petitioners. In many respects, however, the facts are established by the undisputed evidence.

### Statement of the Facts

The petitioners here and defendants in the trial court are Champlin Oil and Refining Company, Hugh M. Briggs, Ben R. Briggs, Clyde H. Alexander, Creston H. Alexander, individually and as independent executor of the estate of Euna M. Alexander, deceased, Helen Mae Dimit and Charles E. Dimit and Norman V. Kinsey, Jr. Champlin Oil and Refining Company was the operator of the processing plant involved in this litigation and acted for and on behalf of its co-defendants, and hereinafter such parties will for the most part be referred to as Champlin. The plaintiffs, respondents here, are M. B. Chastain, Vin-

cent A. Hughes, John P. Costello and Bennett L. Wooley. M. B. Chastain acted for and on behalf of his co-plaintiffs and this group of litigants will hereinafter be referred to as Chastain.

The contract which is the basis of this lawsuit was negotiated during the year 1956 by M. B. Chastain and Charles B. Johnson, Jr., the Champlin Vice President in charge of the company's processing business. For a number of years prior to this time, Champlin had operated a processing plant near Carthage, Texas, which extracted and manufactured from natural gas certain liquid petroleum derivatives generally referred to as "plant products" which consisted of propane, iso-butane, normal butane, liquid petroleum gas, gasoline, fuel oil and kerosene. Champlin's predecessor, the Chicago Corporation, had negotiated an agreement with the Panola County Royalty Owners Association evidenced by a letter dated June 8, 1948, under which a procedure was established whereby the amount of liquid chemical elements making up the manufactured products and contained in the natural gas submitted to the plant could be measured. This measuring process is a highly involved technical procedure from a chemical engineering standpoint and not one easily understood even by experienced producers of petroleum. The measuring device or method set out in the Panola County Royalty Owners Agreement has been in use at Champlin's Carthage plant since 1948 and will be referred to as the "plant formula." In addition to the gas which it produced, Champlin also processed the gas produced by other operators in the field, and the purpose of the "plant formula" was to enable the company to return to the gas producers in the form of processed or manufactured products all of the chemical elements contained in the gas produced by them. For its processing service, Champlin received a percentage of each producer's manufactured products. This percentage varied somewhat depending upon the nature of the gas processed and was a subject of

negotiation between the processor and the producer.

Prior to the time of the Chastain negotiations in 1956, Champlin had prepared a form of contract relating to its processing operations. However, through oversight or misadventure, paragraph No. 8 of the contract, instead of setting forth the Panola County Royalty Owners' formula (the plant formula), embodied an older formula somewhat similar in form and wording, but different in several respects. Champlin says that this formula was an outmoded one, used primarily for the purpose of ascertaining the amount of condensate only contained in gas, rather than one designed to measure the various forms of liquid hydrocarbons actually produced by the plant. The Champlin plant was modified in 1948 so as to extract not only condensate but also propanes, butanes and other products classified as "plant products." The formula actually set forth in the contract will be hereinafter referred to as the "contract formula." It is evident that such formula was placed in the contract through misadventure for since the year 1948 no allocation of "plant products" has been made by Champlin in accordance with the "contract formula," but on the contrary the "plant formula" had been used to measure the "plant products" produced and was being used at the time the Chastain contract was negotiated.

In his negotiations with Johnson, the Champlin Vice President, Chastain contended that he should be charged a comparatively smaller processing percentage because the gas from the four wells which he proposed submitting to the processing plant was rich gas in that it contained liquid elements in excess of the average producing well in the area. There was little discussion as to the terms of the measuring formula to be employed in evaluating Chastain's gas, although there is testimony that Chastain and his associates made some investigation relating to the "contract formula."

Certain changes and corrections were made in the contract submitted by Champlin and thereafter it was finally approved by the contracting parties. The Chastain wells started producing to the plant in the summer of 1957. Each month thereafter, Champlin sent Chastain its regular accounting statement based upon the "plant formula" which showed the actual allocation of the total plant recovery of all liquids from every well (including Chastain's) producing to the plant.

In 1958, Humble Oil and Refining Company and Pan American Petroleum Corporation conducted an audit of Champlin's books and called Champlin's attention to the fact that the allocations being made by Champlin in accordance with the plant allocation formula were not in accordance with the formula contained in the contracts which it had with some 165 producers. Champlin then was confronted with a decision as to its future course of conduct. Should it continue to allocate according to the "plant formula" or should it attempt to adjust to the "contract formula" and in so doing, make further payments to some producers and attempt to recover a portion of the payments theretofore made to the other producers? It seems that generally speaking, the "contract formula" would call for more payments to "rich gas" producers than would the "plant formula." It does not appear, however, that the "plant formula" failed to allocate to the "rich gas" producer, all the liquid hydrocarbons contained in his gas.

Faced with this dilemma, Charles B. Johnson, on behalf of Champlin with the approval of the Company's general counsel, prepared and mailed the following letter, dated September 12, 1958, to all 165 producers, including Chastain, who were affected by the variance between the contract and plant formulae:

"Humble Oil & Refining Company and Pan American Petroleum Corporation have just completed an audit of Champlin's books covering our Carthage Plant operations for the period from August 1, 1955, through Decem-

ber 31, 1957. Since commencement of processing at the Carthage Plant in 1946, these two companies have audited the operation of this plant for themselves and on behalf of others four separate times starting in the year 1950.

"During this most recent audit (just completed in 1958) a question was raised for the first time as to the language in the processing agreements as compared to the actual procedure used by Champlin for the allocation of plant liquids which procedure was agreed upon and set forth in a letter agreement dated June 8, 1948, between the Panola County Royalty Owners Association and The Chicago Corporation (now Champlin Oil & Refining Co.) and a letter from the Royalty Owners Association to The Chicago Corporation dated June 11, 1952.

"The procedure used in allocating plant liquids since this agreement was made with the Royalty Owners Association is fully reflected in the 'Gas and Liquid Production and Disposition Report', complete copies of which you receive monthly. After a review of the matter, Humble agrees with Champlin that this procedure, which has been in actual use since 1948 and as adjusted slightly in 1952, is most equitable and after reviewing the entire matter Pan American expresses no disagreement with the procedure.

"Certainly, a prime requisite for a fair and equitable allocation of liquid products derived from a commingled stream of gas is that the allocation method and procedures for each and every source of gas be identical. We have, therefore, been employing the procedure worked out with the Royalty Owners Association consistently during all this time, and all parties have been fully advised of the allocation through the monthly reports mentioned above.

"We take this opportunity of advising you that it will be our practice to continue to employ the aforementioned procedure as to all producers connected to our plant. If you have any question as to the procedure as heretofore employed, and which we propose to continue, or as to any other matters pertaining to our processing agreement with you, we will be glad to discuss the matter with you. Unless we hear from you to the contrary within thirty (30) days, we will consider that our suggestion for continuing this procedure meets with your approval."

This letter constitutes the focal point of the legal inquiry before us. Chastain made no reply to this letter within thirty days from receipt of such letter, nor did he make any suggestions or objections to the allocating procedures which were continued in accordance with the "plant formula" until sometime in 1961. About March of that year, one Dick Castleberry sought and obtained a meeting in Dallas with M. B. Chastain. Castleberry was accompanied by John McNamara, an attorney of Waco, Texas. At this meeting, Chastain was told that Champlin owed him money and Castleberry said that he had proof of this. An agreement was made whereby in return for information, Castleberry was to receive 40 per cent of any money owed to Chastain by Champlin that Chastain might collect. Several weeks later, Castleberry and a certain Mr. Kinney, formerly an officer of Champlin, met with Chastain, an audit of Champlin's books was made and this suit instituted.

*The Contention of Mutual Mistake*

In support of the contention that the insertion of the allocation formula actually contained in the written contract was the result of a mutual mistake, Champlin requested the submission of two issues, inquiring if (1) the parties "intended that the liquid content of the gas from the Chastain wells should be determined by the same allocation method as the Champlin plant was

using to determine the liquid content of the gas from all other wells producing to the plant," and if (2) the parties "as a result of mutual mistake, believed, at the time they signed it, that the contract language correctly described the allocation method being used to determine the liquid content of the gas from all wells producing to the plant."

For the purpose of deciding the point of mutual mistake, we may consider (despite respondent's argument to the contrary) that Champlin actually made a mistake in the technical sense of the term when it prepared its contracts and inserted therein a discarded measuring formula rather than that set forth in the letter contract with the Panola County Royalty Owners Association. We may also assume that both Champlin and Chastain intended that Chastain should receive all of the liquid hydrocarbons which his gas contained and that the use of the Panola County Royalty Owners' formula (the plant formula) would accomplish this purpose with accuracy. It may well be that Chastain assumed or believed that the formula contained in Paragraph 8 of the contract was the allocation formula being used at the time the contract was negotiated. This would be a natural assumption. It would be unusual, to say the least, for a processing company to offer to contract upon an allocation basis different from that in actual use at the time such offer was made, particularly when there was no discussion of a proposed change in plant operation. It further seems self-evident that a uniform method of measurement and allocation of liquid hydrocarbons is highly desirable if not essential to a processing operation of the kind Champlin was conducting. The use of two or more different formulae could and probably would result in the allocation of more or less than 100 per cent of the liquid hydrocarbons taken from the gas processed at the plant.

■ However, Champlin's claim of mutual mistake must necessarily fall because of a failure to prove that Chastain agreed that the liquid hydrocarbons in his gas should be measured by the "plant formula". The equitable reformation of a written contract is based upon the premise that a contract was actually made, but the written memorandum thereof, because of a mutual mistake, does not truly reflect the actual agreement of the parties. "Reformation is a proper remedy when the parties have reached a definite and explicit agreement, understood in the same sense by both, but, by their mutual or common mistake, the written contract fails to express this agreement." Black on Rescission and Cancellation, Sec. 11, cited with approval in Marlin Associates v. Trinity Universal Ins. Co., 226 S.W.2d 190 (Tex.Civ.App. 1950, no wr. hist.) and Continental Casualty Co. v. Bock, 340 S.W.2d 527 (Tex.Civ.App. 1960, ref. n. r. e.). See also 49 Tex.Jur.2d Reformation of Instruments, § 9.

■ In Indemnity Ins. Co. of North America v. W. L. Macatee & Sons, 129 Tex. 166, 101 S.W.2d 553 (1937), this Court held that: "One is presumed to intend what he does or undertakes to do by the terms of a written instrument voluntarily signed by him." We are therefore required to start with the presumption that Chastain intended to contract with reference to the allocation formula contained in paragraph 8 of the contract which he signed. He examined the contract. He and his associates had others examine it for him. It is undisputed that the method of liquid hydrocarbon allocation was not discussed between Johnson and Chastain. Every species of belief and assumption will not afford a basis for relief by way of reformation. Many contracts are made and enforced despite some collateral misapprehension which may have an important bearing upon the contractual situation. Despite hardship, relief by reformation will be denied in the absence of proof of a definite agreement between the parties which has been misstated in the written memorandum because of a mistake common to both contracting parties. In our opinion the evidence was legally insufficient to show a mutual mistake on Chas-

tian's part and further the form of submission requested by Champlin was defective in that it failed to submit the basic issue of whether or not Champlin and Chastain agreed that the "plant formula" should measure the liquid hydrocarbons contained in Chastain's gas. A definite agreement, a meeting of the minds, is basic to the remedy of reformation. Cf. Pegues v. Dilworth, 134 Tex. 169, 132 S.W.2d 582 (1939); Sun Oil Company v. Bennett, 125 Tex. 540, 84 S.W.2d 447 (1935).

### The Contention of Equitable Estoppel

Petitioners contend that respondents are estopped from questioning the allocation of "plant products" which were measured by and delivered to them under the "plant formula." In making this contention, Champlin relies primarily upon the jury's answers to special issues Nos. 2, 3, 4 and 5. The trial court submitted numerous special issues, many of which were eviden-

tiary rather than ultimate in nature.[1] For discussion purposes here, we set out Special Issues Nos. 1 to 5, inclusive.

1. "Do you find from a preponderance of the evidence that the plaintiffs knew prior to the time when Chastain met John McNamara, that the allocation method used by the defendants was different from the allocation formula described in the Natural Gas Processing Agreement? *Answer: No.*

2. "Do you find from a preponderance of the evidence that the plaintiffs, prior to the time when Chastain met John McNamara, could have discovered by the use of ordinary care that the allocation method used by defendant was different from the allocation formula described in the Natural Gas Producing Agreement? *Answer: Yes.*

3. "Do you find from a preponderance of the evidence that the plaintiffs,

---

1. The jury answered some of the issues and failed to answer others. The verdict returned disclosed the following:

(1) Chastain did not know Champlin was using an allocation formula different from the contract formula until Chastain was so informed in February or March 1961; (2) Chastain, prior to that time, could have discovered by the use of ordinary care that the allocation method used by Champlin was different from the contract formula; (3) Chastain's acts, conduct, or silence led Champlin reasonably to believe that Chastain approved of the continuation of the non-contract allocation formula; (4) Champlin relied upon such acts, conduct or silence; (5) but for such acts, conduct, or silence of Chastain, Champlin would have taken voluntary action or legal proceedings to protect itself against loss from the use of more than one allocation method. The jury left unanswered the next four issues which inquired whether (6) Champlin rendered monthly accountings which showed the allocation formula used in computing payments credited to the Chastain wells; (7) Chastain's retention without objection of the monthly accountings from June, 1957 to March, 1961 was for such a length of time that Champlin could reasonably assume Chastain was in agreement with the non-contract allocation

formula; (8) Chastain acquiesced in the non-contract formula; (9) Champlin relied upon the apparent acceptance by Chastain, by altering its position so that it would prejudice Champlin to require a reaccounting to Chastain. The jury then answered that (10) Chastain delayed in asserting a claim against Champlin for a length of time sufficient that Champlin would have good reason to believe that Chastain would not assert any claim because of the difference between the non-contract allocation formula and the contract formula; (11) but during that period, Champlin did not change its position in any way which would make it unjust for Chastain to assert his claim; (12) Champlin has distributed to the Chastain wells the amount of liquids produced by those wells; (13) Champlin had equal knowledge or access to equal knowledge as Chastain that the non-contract allocation formula was not the formula provided in the written contract; (14) Champlin failed to exercise ordinary care to protect itself from injury or detriment; and (15) Champlin failed to use ordinary care in failing to advise Chastain that the non-contract formula used by Champlin resulted in Chastain's being allocated less plant products than was provided in the contract.

by acts, conducts, or silence, if any, led Champlin reasonably to believe that the plaintiffs approved of the continuation of the allocation method being used by the Champlin plant? *Answer*: *Yes*.

4. "Do you find from a preponderance of the evidence that Champlin relied upon such acts, conduct, or silence of the plaintiffs, if any you have found in answer to the foregoing special issue? *Answer*: *Yes*.

5. "Do you find from a preponderance of the evidence that but for such acts, conduct or silence of the plaintiffs, if any you have so found, Champlin would have taken voluntary action or legal proceedings to protect itself against loss if any resulting from the use of more than one allocation method? *Answer*: *Yes*.

Champlin's argument is that although from and after the letter of September 12, 1958, Chastain may not have had conscious knowledge that there was difference between the "contract formula" and the "plant formula", nevertheless, Chastain by virtue of the information contained in such letter and the statements subsequently rendered to him, must be charged with notice of the divergence between the formulae in view of the holdings of the jury.

Chastain answers this argument by asserting primarily that the jury's answers to Special Issues Nos. 2, 3, 4 and 5 are not controlling of the case. It is urged that Champlin's letter of September 12, 1958, did not clearly disclose the situation to Chastain even when taken in connection with the statements subsequently delivered to him. It is also urged that there was no evidence to support the jury's answers to said Issues Nos. 2, 3, 4 and 5, and that such answers were contrary to the overwhelming preponderance of the evidence.

The Court of Civil Appeals agreed with Chastain's primary position and held as a matter of law that Champlin's letter of September 12, 1958, which was delivered to Chastain as well as to all of the other producers furnishing gas to Champlin's processing plant "was calculated to deceive and mislead Chastain." Much emphasis is placed upon the statement in the letter that "Humble agrees with Champlin that this procedure (the plant formula) which has been in actual use since 1948 and adjusted slightly in 1952 is most equitable and after reviewing the entire matter Pan American expresses no disagreement with the procedure." It is pointed out that Humble and Pan American would receive more credits for "plant products" under the "plant formula" than they would under the "contract formula". The basis of the decision of the Court of Civil Appeals is the broad maxim of equity, that he who seeks equity must come into court with clean hands; that "[t]he doctrine of estoppel is for the protection of innocent persons, and only the innocent may invoke it." 31 C.J.S. Estoppel § 75, p. 453. Some reliance is also placed upon the jury's finding that "Champlin failed to use ordinary care in failing to advise plaintiffs (Chastain) that the method of plant allocation that defendants (Champlin) were using resulted in plaintiffs being allocated less plant products than was provided for in the natural gas processing agreement."

We do not follow this negligence argument. There was nothing careless about the notification Chastain received, even if such notice be deemed insufficient. The letter of September 12, 1958 was deliberately written. Chastain contends that it was artfully composed, designed to conceal rather than disclose. And this is essentially the basic premise of his argument.

Equitable maxims suggest avenues of investigation, but decrees are usually based upon definite and specific guide lines. This lawsuit belongs to a specific category. It is essentially an accounting suit in that it involves an account running between the processor of gas on one hand and a producer of gas on the other. Millions of

dollars have been paid out to numerous producers from month to month extending over a period of years. Many of the principles of an account stated have application here in view of the monthly statements rendered by Champlin to Chastain. Had Chastain actually and consciously realized that Champlin was operating upon an allocation basis different from that prescribed in the contract, an estoppel would have undoubtedly arisen against him, particularly after he had been requested in 1958 to make known any objections he might have to Champlin's continuing to operate the plant upon the allocation basis which had been in force since 1948.

In re Shoemaker, 277 Pa. 424, 121 A. 510 (1923) by the Supreme Court of Pennsylvania, is closely in point here. It there appeared that the owners of adjoining lands underlaid with coal decided to conduct mining operations for their pecuniary advantage and agreed that the various tracts should be operated as a unit. The mining lease covering the tracts set forth a method of fixing the respective portions of the rents due each owner. This method was based upon an estimate of the coal underlying each of the tracts involved. However, in 1901 after receiving a report from a mining engineer that the coal in one of the veins was practically exhausted, the trustee in charge of disbursements from the proceeds of the mining operation notified all interested parties that the method of allocating royalties upon the basis of the estimated coal reserves would be discontinued and payment would thereafter be made upon the actual amount of coal produced from each tract. The trustee stated:

"I deem it advisable and really imperative to discontinue the payment of royalty on this vein on percentages as formerly, and in lieu thereof, make payments on a basis of actual mining or yield from each respective holding. As a consequence, some will receive for a time no royalty, some less, while others will receive an increase."

The scheme of division set forth in the 1901 letter was followed for some eighteen years, yet, nevertheless, the Court of Common Pleas held that the plan of allocating royalties set forth in the lease (based upon estimated reserves) was controlling. The Supreme Court reversed, holding that notwithstanding the circumstance that the royalty allocation provisions contained in the lease were unambiguous, the eighteen years acquiescence in the division formula set forth in the 1901 letter raised an estoppel against the royalty claimants which precluded them from questioning the trustee's royalty allocations. The Court said:

"[T]he trustee advised all parties of the intended change (in the royalty allocation method), and that all would be paid thereafter as coal was mined under their several lots, and this was done, at the market price, without any objection for a long period of time. Some owners received prompt return for all they owned, while others were denied any. The lessors, with knowledge of the facts, permitted the substituted plan to be carried out, though it increased the present benefit to some at the expense of others, and ended in payment to a few for all the remaining coal owned, at the current rates, thus effecting, as far as they were concerned, the apparent purpose sought to be realized when the trust agreement was made. It would be inequitable to now permit a collection of a larger amount, based on the value of the unmined coal of others. If the price had fallen, instead of increasing, no recovery, in relief of those still owning, could have been had, the plan of payment having been in force with the consent of all, and those satisfied in full, or in part, should not be permitted now to repudiate the understanding.

" 'Where a person, with actual or constructive knowledge of the facts, induces another by his words or conduct to believe that he acquiesces in

or ratifies a transaction, or that he will offer no opposition thereto, and that other, in reliance on such belief, alters his position, such person is estopped from repudiating the transaction to the other's prejudice. And this is so regardless of the particular intent of the party whose acquiescence induces action.' 21 C.J. 1216.

" 'But it seems that the acquiescence need not involve anything in the nature of a positive affirmation, as the rule is well recognized that when a party with full knowledge, or with sufficient notice or means of knowledge, of his rights and all the material facts, remain inactive for a considerable time or abstains from impeaching the transaction, so that the other party is induced to suppose that it is recognized, this is acquiescence, and the transaction, although originally impeachable, becomes unimpeachable.' 10 R.C.L. 694.

"If one, knowing his rights, sees the other acting on a mistaken notion as to his, an estoppel may arise. P. & R. C. & I. Co. v. Schmidt, 254 Pa. 351, 98 Atl. 964; Lancaster v. Flowers, 208 Pa. 199, 57 Atl. 526, and authorities there cited."

The quotations from Corpus Juris and Ruling Case Law suggest the vital issue contained in the equitable estoppel contention. The phrases, "[w]here a person, with actual or constructive knowledge of the facts" and "when a party with full knowledge, or *with sufficient notice or means of knowledge*" are used. See, 31 C.J.S 589, Estoppel § 114, 19 Am.Jur. 676, Estoppel, § 62. In the present case the jury has found that Chastain long prior to the time he instituted this suit could have discovered by the use of ordinary care that the allocation method used by Champlin was different from that contained in the Natural Gas Processing Agreement which he had signed. Is this finding taken in connection with the undisputed evidence—the knowl-

edge imparted by the letter of October, 1958—sufficient in law to impute to Chastain, notice of a difference between the "plant formula" and the "contract formula", or stated another way, can it be said in the light of the jury's finding that Chastain had sufficient means of knowledge to charge him with notice of the fact that the plant formula and the contract formula were not identical? If so, then this case would come within the rule of the Pennsylvania case which is regarded as a sound decision relating to the problem before us.

Whatever may be said as to the artfulness of Champlin's letter to those producing to its processing plant, such letter stated in words that no one could misunderstand that (1) a question had been raised as to the language in the processing agreements (the contract formula) as compared to the actual procedure (the plant formula) used by Champlin for the allocation of plant liquids (plant products); that (2) it was desirable that the same allocation formula be applied to all producers in the area, and that (3) unless objection was made, Champlin would continue to use the "plant formula". The letter further referred Chastain to the monthly reports designated as "Gas and Liquid Production Reports" which Chastain had in his office. These reports not only showed what and how the plant liquids were allocated to Chastain, but contained the same information for the 164 other producers, including Champlin. These reports if carefully examined would disclose the difference in the two formulae simply by comparing the reports with the contract allocation. The letter to Chastain reported to him that the procedure used in allocating plant liquids was fully reflected in the Gas and Liquid Production and Disposition Reports, complete copies of which he received monthly. The truth of this representation is borne out by the testimony of Mr. Berry Holmes, an independent public accountant of Dallas, Mr. William E. Rembert, Jr., the man in charge of Chastain's accounting and who really acted as Chastain's "righthand man", and Mr.

Hillier, an independent public accountant with Price Waterhouse & Company, which concern was employed by Chastain to make an analysis of the same accounting statements to which the letter referred. All three testified in effect that the monthly reports made a full disclosure of the method of allocation used in the plant operation. Mr. Rembert further testified that the difference in the allocation method used at the plant and that described in the processing agreement was apparent on the face of the production and disposition reports.

However, Chastain, and his office, made no check or review of the monthly reports sent to them, although their attention was specifically directed to the reports by the September, 1958, letter. Had a check been made, many details which Chastain now says were concealed would have been disclosed. This is demonstrated by the fact that William E. Rembert, Chastain's accountant, for the purposes of this suit, actually calculated the additional barrels of liquid which would have been allocated to Chastain by application of the allocation method set forth in the contract. In making this calculation, Rembert used the monthly reports which Chastain had in his office and demonstrated that he thoroughly understood the details of the reports and the operation of the plant allocation method.

■ It therefore appears that within a short time after operations commenced under the gas processing contract, Chastain had reports in his office from which he could have ascertained that the accounting rendered by Champlin was not in accordance with the terms of the contract. The letter of September 12, 1958, rather pointedly called his attention to the fact that a question had been raised as to whether or not the accounting basis in use was the one which was prescribed in the contract and he was advised that unless objection was made within a thirty day period, Champlin would continue accounting to its gas pro-

ducers on the same basis that had been used in the past. Then, in March of 1961, Chastain had his conversation with Castleberry and Castleberry informed him that if the contract formula were followed, he would receive an additional amount of money. Surely, had Chastain taken no action after the Castleberry interviews, he would not be in a position some years later to question the liquid hydrocarbon accounts. However, Castleberry gave Chastain no information he could not have obtained by examining the reports in his office. Conceding that Chastain might be excused for a failure to examine such reports prior to September 12, 1958, may it be said as a matter of law that he was also excused for a failure to examine such reports and compare the same with his contract from and after September 12, 1958, when he was told that a question as to the accounting basis had arisen and asked to make known any objection he might have to a continuation of the existing accounting method? We are of the opinion that it may not. We think there was some evidence from which a jury could conclude that the means of knowledge were available to a reasonably careful person and hence knowledge of Champlin's use of an allocation formula different from that set out in the contract should be imputed to Chastain. This case is one involving an account, and generally in the business world when an account is presented, the opposite party is under some duty to object thereto if the same be incorrect or inaccurate. Especially is this true when an explicit request for objection is made if the recipient be not satisfied with the accuracy of the account. The underlying principle is that of equitable estoppel or estoppel in pais. This doctrine was recognized by this Court in the case of Love v. Barber, 17 Tex. 312 (1856) in which it was said:

"The doctrine of an estoppel, not of record or under seal, called an estoppel *in pais,* was left for a considerable time in a state of perplexity and uncertainty. It is, however, believed that

various adjudications have settled the doctrine on principles easy to be understood. Nowhere has it been more concisely and clearly laid down than by Lord Denman in the case of Pickard v. Sears, Eng. C. L. vol. 33, p. 117, [112 Eng.Rep. 179]. He says 'that the rule of law is clear, that when one, by his words or conduct, wilfully causes another to believe the existence of a certain state of things, and induces him to act on that belief, so as to alter his own previous position, the former is concluded from averring, against the latter, a different state of things, as existing at the same time; and the plaintiff in this case might have parted with his interest in the property by a verbal gift or sale, without any of these formalities that throw technical obstacles in the way of legal evidence.' (See Walker's Adm'r v. Livingston et al., 3 Tex. 93.) This rule is much to be admired for its simplicity, its briefness, and it yet being expressive of the whole doctrine on the question."

In the case of Gregg v. Wells, 10 Ad. & E. 97, 113 Eng.Rep. 35 (1839), Lord Denman referred to his former opinion and said:

"Pickard v. Sears (6 A. & E. 469), was in my mind at the time of the trial, and the principle in that case may be stated even more broadly than it is there laid down. A party, who negligently or culpably stands by and allows another to contract on the faith and understanding of a fact which he can contradict, cannot afterwards dispute that fact in an action against the person whom he has himself assisted in deceiving."

It seems clear that under certain circumstances, one having the means of knowledge may be held to the same standard of responsibility as one possessing conscious knowledge. In Dimond v. Manheim, 61 Minn. 178, 63 N.W. 495 (1895), the Court after citing and quoting from Pomeroy,

Equity Jurisprudence, set forth the following rules:

"The authorities are, however, substantially all agreed upon the following general propositions: First, to create an estoppel, the conduct of the party need not consist of affirmative acts or words. It may consist of silence or a negative omission to act when it was his duty to speak or act. Second, it is not necessary that the facts must be actually known to a party estopped. It is enough if the circumstances are such that a knowledge of the truth is necessarily imputed to him. Third, it is not necessary that the conduct be done with a fraudulent intention to deceive, or with an actual intention that such conduct will be acted upon by the other party. It is enough that the conduct was done under such circumstances that he should have known that it was both natural and probable that it would be so acted upon."

It has been determined by Texas authority that imputed actual notice carries with it the same legal consequences as conscious knowledge. In Hexter v. Pratt, 10 S.W.2d 692, (Tex.Com.App.1928) it was said:

"Notice in law is of two kinds—actual and constructive. * * * In common parlance 'actual notice' generally consists in express information of a fact, but in law the term is more comprehensive. In law whatever fairly puts a person on inquiry is sufficient notice, where the means of knowledge are at hand, which if pursued by the proper inquiry the full truth might have been ascertained. Means of knowledge with the duty of using them are in equity equivalent to knowledge itself. * * * So that, in legal parlance, actual knowledge embraces those things of which the one sought to be charged has express information, and likewise those things which a reasonably diligent inquiry and exercise of the means of

information at hand would have disclosed."

The Hexter case was cited with approval by this Court in Woodward v. Ortiz, 150 Tex. 75, 237 S.W.2d 286 (1951), wherein it was said:

"It may well be, however, that the tax attorney and the County were charged with *actual notice* of the judgment even though they had no *express knowledge* thereof. *Actual notice* 'embraces those things of which the one sought to be charged has express information, and likewise those things which a reasonably diligent inquiry and exercise of the means of information at hand would have disclosed.' "

The theory that Champlin relied on Chastain's silence after receiving the letter of September 12, 1958, has support in the fact that Champlin told · Chastain that it would rely upon his silence and continue accounting for "plant products" in accordance with the "plant formula" then in use. Champlin thereafter distributed millions of dollars representing the proceeds from the liquids allocated to the various producing wells in accordance with the "plant formula". By so doing, it continued to allocate less liquid products to some wells and more liquid products to other wells than it would have done under the "contract formula". Since Champlin had contracts with all of the other 164 producers which contained the same allocation formula as that contained in Chastain's processing contract, it would follow that if Champlin were compelled to pay Chastain the difference between the "plant products" which would have been allocated to him under the "contract formula" and those actually delivered under the "plant formula", then Champlin would have been able to recoup (in part, at least) by requiring a reallocation of products as to all other producers in conformity with the literal provisions of the formula set out in Section 8 of the gas processing agreement. If Champlin relied upon Chastain's silence in continuing to operate under the "plant formula", then it lost its opportunity to reallocate the "plant products" under the "contract formula" and thus minimize its losses. There is some evidence supporting the jury's findings to Issues Nos. 2, 3, 4 and 5, and those findings are sufficient in law to support an estoppel precluding Chastain from now questioning his account with Champlin on the ground that the allocation of liquid hydrocarbons should have been made in accordance with the "contract formula" rather than the "plant formula". This requires a reversal of the judgments of the Courts below.

### Champlin's Complaint as to the Exclusion of Evidence

We need not further lengthen this opinion by an extended discussion of these complaints. The evidence excluded consisted for the most part of charts and diagrams designed to summarize and perhaps emphasize the testimony of Champlin's witnesses. The admission of evidence of this kind generally lies within the discretion of the trial judge. The exclusion of the proffered evidence in this case did not constitute a reversible error, nor can it be said that such evidence was vital in determining the "no evidence" points in this Court, nor the "weight and preponderance" points in the Court of Civil Appeals.

### Chastain's Conditional Application

In a conditional application for writ of error, Chastain contends that the Court of Civil Appeals erred in sustaining Champlin's contention with reference to the four-year statute of limitations and modifying the trial court's judgment because of such holding. The intermediate court's holding was that certain payments made by Champlin to Chastain were designated as being for gas products sold by Champlin for Chastain's account for specific periods of time and that accordingly the general rule that payments on an account should be credited to first maturing items thereof was

not wholly applicable to the account involved. For a statement of the rule, see Curry v. O'Daniel, 102 S.W.2d 481 (Tex. Civ.App.1937, wr. ref.). We find no error in the Court of Civil Appeals' holding that the specially designated payments operated to vary the general rule and we are further of the opinion that there is evidence to support the finding that certain payments were made for designated months. Of course, should there be another trial, the evidence relating to payments for specified months may be different or more complete than that contained in the record now before us.

■ Chastain also contends that he is entitled to attorney's fees under the provisions of Article 2226, Vernon's Ann.Tex. Civ.Stats., in that under the contract he furnished materials to Champlin. The contract obligated Chastain to deliver or cause to be delivered to Champlin's processing plant a volume of natural gas which was to be processed for the recovery of various hydrocarbons called "plant products" and that a portion of such products would be sold by Champlin to third persons for Chastain's account and the products remaining would be retained by Champlin as a processing fee. The gas delivered to Champlin for processing under this agreement is not within the meaning of "material furnished" as that term is used in Article 2226, and the Court of Civil Appeals was correct in so holding.

*Chastain's Contention that the Jury's Answers to Special Issues Nos. 2, 3, 4 and 5 are Against the Overwhelming Preponderance of the Evidence*

■ Our jurisdiction extends to questions of law only. Article 5, § 3, Texas Constitution, Vernon's Ann.St. Questions of whether or not a jury finding is against the overwhelming preponderance of the evidence lies within the exclusive jurisdiction of the Court of Civil Appeals. Article 5, § 6, Texas Constitution; King v. King, 150 Tex. 662, 244 S.W.2d 660 (1951); Calvert,

" 'No Evidence' and 'Insufficient Evidence' Points of Error"; 38 Texas L.Rev. 361 (1960); Garwood, "The Question of Insufficient Evidence on Appeal"; 30 Texas L. Rev. 803 (1952). Chastain has preserved his points asserting that the jury's findings here are against the weight and preponderance of the evidence by complying with Rule 324, Texas Rules of Civil Procedure.

■ As pointed out in the forepart of this opinion, Chastain contended in the Court of Civil Appeals that as a legal proposition, the jury's answers to Special Issues Nos. 2, 3, 4 and 5 were immaterial in that it appeared as a matter of law that Champlin could not claim an estoppel because of its own conduct in the premises. 379 S.W. 2d 938, l. c. 942. We disagree with that holding and have held that there was *some* evidence supporting the jury's findings to Special Issues Nos. 2, 3, 4 and 5. The discussion in this opinion has reference to legal questions only as we have no fact jurisdiction and for that reason we have called attention to those portions of Champlin's letter of September 12, 1958 which constituted some evidence supporting the jury's findings upon which an estoppel is predicated,—such as, notice that a question had arisen as to the allocation formula, the desirability of applying the same formula to all producers and the request for notification if further distributions in accordance with the "plant formula" would not be satisfactory. The overwhelming preponderance question is another matter. It relates to the power to grant a new trial, which power is essentially the same whether exercised by a Court of Civil Appeals or a trial court. It is a "fact" and not a "law" jurisdiction. Contrary to the historic practices of most Anglo-American jurisdictions, juries are used to determine equitable rights and claims in Texas. A jury verdict is not merely advisory although it is to be tested by both the "no evidence" and "the overwhelming preponderance" rules. This is made abundantly clear by this Court's decision in Sanders v. Harder, 148 Tex. 593, 227 S.W.2d 206 (1950).

The Court of Civil Appeals did not discuss and obviously did not pass upon the question of whether the jury's answers were against the overwhelming preponderance of the evidence. The rule of Barker v. Coastal Builders, 153 Tex. 540, 271 S.W.2d 798 (1954), stated on rehearing, is not applicable to this case. It is necessary that the cause be remanded to the Court of Civil Appeals to pass upon the weight and preponderance questions.

### Conclusion

For the reasons herein stated, the judgments of the trial court and the Court of Civil Appeals are reversed and this cause remanded to the latter Court for further proceedings in keeping with this opinion.

CALVERT, C. J., and GRIFFIN, WALKER and POPE, JJ., dissenting.

HAMILTON, Justice (concurring).

I agree with the court's holding on the question of estoppel and agree with the judgment the court entered in this case. However, I am in disagreement with its holding on the question of mutual mistake. I would reverse the judgments of the courts below on the additional ground that the courts erred in holding that petitioners failed to make out a case to go to the jury on the question of mutual mistake. The petitioners are seeking relief by way of reformation of the contract in question on the ground of mutual mistake. This of course is an equitable remedy which is designed to give relief where grave injustice would result from the enforcement of a contract by reason of a provision included therein which does not express the intention of the parties but was contrary and at variance with the real and mutual intention of the parties.

According to this record if respondents were allowed to enforce the contract as written the result will be that the petitioners will be required to pay to respondents $118,-076.25 for products never produced from respondents' wells from the period of November 30, 1957, to August 25, 1961, and will be required to continue paying respondents for products not produced from their wells in the same proportion from 1961 to 1977, the termination date of the contract in question. At the past rate of production, by the end of the contract period petitioner will be required to pay respondents well over one-half million dollars for liquid products allocated to respondents' wells in excess of the liquid products produced therefrom.

Since the trial court ruled as a matter of law that Champlin failed to make out a case of mutual mistake the evidence on the question must be viewed in the light most favorable to Champlin. Therefore the court may make certain assumptions where there is supporting evidence.

The assumption that Champlin and Chastain intended that Chastain should receive all of the liquid hydrocarbons which his gas contained (no more, no less) after deduction of an agreed percentage for processing fee is supported by provisions of the contract about which there is no question. The contract is clear that the over-all purpose is that Chastain should get back the liquid hydrocrabon products contained in his gas, plus the residue gas, less the processing fee. It is further clear from the contract that the formula contained in paragraph 8 was designed to accurately allocate the liquid hydrocarbon products to the gas produced from Chastain's wells. It may be further assumed that the formula contained in paragraph 8 did not accomplish this purpose. There is ample evidence in the record that the use of this formula caused an allocation of more hydrocarbon liquid products to Chastain's gas than was therein contained. It is uncontradicted that the formula described in paragraph 8 was at variance with the allocation formula in actual use at the plant. The evidence showed, and the jury so found, that the formula in use at the plant resulted in an allocation to Chastain's gas of all the liquid hydrocarbons contained therein.

At the time of entering into the contract both parties thought that the plant formula would accomplish the purpose of accurately allocating the liquid hydrocarbon products to Chastain's gas. Both parties intended that the plant formula be used in the allocation of the hydrocarbon products. At the time the contract was signed both parties thought that the formula described in paragraph 8 was in fact the allocation formula in use at the plant. We then have both parties having an identical intention as to what the contract should contain with reference to the allocation formula. We have both the parties mutually mistaken in thinking that the contract did contain the formula in use at the plant. The contract did not contain the formula actually intended by the parties, but contained a different formula, the enforcement of which would result in a windfall to one party and severe loss to the other, so the mistake is therefore material. This is all that is necessary to make out a case of mutual mistake.

We quote from the Restatement of the Law of Contracts, Sec. 504 (1932), as follows:

"Sec. 504. Reformation for Mutual Mistake.

"Except as stated in §§ 506 and 509–511, where both parties have an identical intention as to the terms to be embodied in a proposed written conveyance, assignment, contract or discharge, and a writing executed by them is materially at variance with that intention, either party can get a decree that the writing shall be reformed so that it shall express the intention of the parties, if innocent third persons will not be unfairly affected thereby.

"*Comment*:

"a. The remedies allowed for mutual mistake are reformation and, where reformation is not allowable, rescission and restitution as allowed in the case of all other voidable contracts.

"b. The right to have reformation is ordinarily limited to written agreements (but see § 507). As to them it is essential for reformation that the parties shall have had the same intention. But it is not necessary that they should have carried out that intention and actually entered into a legal transaction before they made the writing. *It is enough that they both intended when the writing was made that its terms should be of a certain character and that this intention was not expressed.* Sometimes where parties enter into a written agreement, an oral contract precedes the formation of the writing (see § 26). *Sometimes, however, there is no such oral contract prior to the execution of a written instrument, and it is not essential for reformation that there should have been.* All that is necessary is that the parties have come to a complete mutual understanding of all essential terms of their bargain. This is necessary; otherwise there would be no standard in accordance with which the writing could be reformed.

"c. The province of the remedial right of reformation is to make a writing express the bargain which the parties desired to put in writing. * * *" (Emphasis added.)

See Texas Annotations, Restatement of the Law, par. 504, p. 301, for citation of Texas cases following this section.

This not only seems to be the law in Texas, but also in most all other jurisdictions. From 76 C.J.S. Reformation of Instruments § 25 a, p. 348, we quote:

"In order to establish a mistake in an instrument, it is not necessary to show that particular words were agreed on by the parties as words to be inserted in the instrument; it is sufficient that the parties had agreed *to accomplish a particular object* by the instrument to be executed, and that *the instrument as executed is insufficient to effectuate*

*their intention."* (Emphasis added.) 76 C.J.S. Reformation of Instruments § 25 a, p. 348.) Accord: Franz v. Franz, 308 Mass. 262, 32 N.E.2d 205, 135 A.L.R. 1448 (1941); 5 Williston on Contracts (Rev. ed.), secs. 1585, 1586, p. 4424 and p. 4426; 135 A.L.R. 448.

The parties never discussed the question of an allocation formula. Consequently, there could not have been any specific oral contract between the parties, to the effect that Champlin agreed with Chastain, in so many words, that the liquid hydrocarbons contained in Chastain's gas should be measured by the allocation formula in use at the plant. For failure to make proof of such an agreement the court says that Champlin's claim of mutual mistake must fall.

What the court fails to consider is that the parties may be in agreement on a particular matter without having formally stated the agreement in specific words. Of course if the party claiming mutual mistake is relying on a prior oral agreement to establish mutual mistake, then certainly such an agreement must be proved. This was the situation in the case of Pegues v. Dilworth, 134 Tex. 169, 132 S.W.2d 582, where the plaintiff below relied on an oral agreement which through mutual mistake was not incorporated in the contract. The question before the Supreme Court on a no evidence point was whether there was some evidence to support the jury's finding of mutual mistake. This court held that there was.

The court in the instant cause cites no case in support of its position. In addition to the above case it does invite attention to Sun Oil Co. v. Bennett, 125 Tex. 540, 84 S.W.2d 447, but this case makes no such holding as the court here has made. There the court held as a matter of law that the description in an oil and gas lease covered and included the 2.59 acres in question. The jury was asked if the parties mutually intended that the 2.59-acre tract be included in the description. The answer was "no". The court simply held that an answer of "no" was not a finding that both parties mutually intended that the 2.59-acre tract not be included. One of the parties could have intended for it to be included, the other not, still the jury would have had to answer "no".

I would hold that the Court of Civil Appeals and the trial court were in error in holding that Champlin did not make out a case of mutual mistake sufficient to go to the jury.

SMITH, J., joins in this opinion.

POPE, Justice (dissenting).

I respectfully dissent. The majority has correctly held that Champlin proved no basis to reform its contract with Chastain. The Court has incorrectly held that Chastain is equitably estopped from recovery on the contract. I would affirm the judgment of the Court of Civil Appeals. Champlin, in my opinion, is ineligible to invoke the aid of a court of conscience to defeat its contractual liability. It breached the contract it drafted, discovered almost three years before Chastain that it was breaching it, was under a duty to make full and fair disclosure of its discovery but did not do so, and owes Chastain $118,076.25. The jury found that Champlin knew it was withholding funds from Chastain almost three years before Chastain discovered it and the jury refused to find that Champlin acted in reliance upon Chastain's failure to protest. The jury also found that Champlin did not change its position in any way which would make it unjust for Chastain to assert his claim. Champlin has been permitted to keep large sums that were owing Chastain. During one test month, that of November, 1957, Champlin learned it short-measured Chastain 4,218 barrels of product while it was taking for itself an excess of 4,187 barrels. The majority holds it would be inequitable to hold Champlin to its agreement.

Champlin's defense of equitable estoppel needs to be placed in proper focus. The

contract upon which Chastain sued is between him and Champlin only. Other producers who supplied gas to the Champlin plant, had separate contracts and none of them is in evidence. Chastain was not a party to any of them. His contract, like the others, was separately negotiated and executed. Chastain's consideration for his processed product was governed by the method stated in his own contract and was not dependent upon any of the many separately negotiated contracts between Champlin and others. Chastain's rights were not dependent upon and did not purport to be based upon an allocation plan that was uniform. Panola County Royalty Owners Association was not referred to nor mentioned in the negotiations for nor by the terms of the Chastain contract. Chastain initiated negotiations with Champlin in 1956 and Charles Johnson, Champlin's Vice-President on September 17, 1956, submitted a draft of a contract to Chastain. Johnson's letter of transmittal stated: "The contracts are somewhat flexible and may be altered to a specific condition and processing consideration." This is contrary to the notion that runs through the majority opinion that it was intended that all producers should share alike and proportionately. On October 9, 1956, Johnson sent a revision of the earlier draft and specifically invited Chastain's attention to changes in Section 8 of the contract which section fixed the settlement basis between Champlin and Chastain, and is the one in dispute. Chastain then obtained the advice of an attorney in Shreveport, another in Dallas, and the engineering department of the First National Bank in Dallas. These experts compared the allocation method described by revised Section 8 of the contract with the method used by Champlin's competitors in the area. After these investigations were taken, Chastain executed the contract.

Champlin and Chastain have agreed that the difference between the sum paid Chastain and the amount owed him under the contract is $118,076.25. They agreed that the difference between the contract formula and the method Champlin actually employed "may be calculated with mathematical certainty." They agreed that, in the event of final judgment against Champlin "the parties will adjust the accounts between them for the plant products marketed after July 31, 1961, on the same date, i. e., using the same method of allocation which it was determined should have been in accounting for plant products marketed prior to August 1, 1961." In other words, Champlin breached its contract and owes Chastain $118,076.25. It can pay this amount without disturbing any of the other producers. Since Champlin began its processing enterprise it has distributed more than $77,000,000.00 for processed plant product among its many gas producers and suppliers. However, of this sum, Champlin has distributed to itself as a supplier and as its fee for processing, the sum of $39,208,000.00. What Chastain urges is that Champlin, instead of receiving $39,208,000.00 during its period of processing, should have received only $39,089,-927.75. The argument that a judgment against Champlin would require a disruption of its allocation plan and the entire plant operation, loses sight of the fact that all Champlin need do is to pay up as it agrees it can.

### Champlin's Duty to Speak

When Champlin made its discovery in 1958 that its plant formula was in violation of the Chastain contract it had a duty to speak by making a full and fair disclosure to Chastain who did not learn of the breach until three years later. "He who is silent when he should speak must be silent when he would speak, if he cannot do so without a violation of law and injustice to others." Consolidated Fruit-Jar Co. v. Wright, 94 U.S. 92, 96, 24 L.Ed. 68 (1876). By ignoring this basic rule, the majority has permitted the ineligible party, not only to breach its contract, but also to breach its further duty to make a full and fair disclosure upon making its discovery. Despite these two Champlin wrongs, it has been

permitted to gain a windfall of $118,076.25. The jury found, and the finding is not attacked, that Champlin had full knowledge as early as August of 1958 that it was not distributing products correctly and that Chastain did not learn of it until 1961.

Ordinarily the one (Champlin) who asserts estoppel as a defense against another's (Chastain's) claim must be the one who is without knowledge of the material facts. Harrell v. City of Lufkin, (Tex.Com.App.), 280 S.W. 174, 177 (1926); Moore v. Carey Bros. Oil Co., 246 S.W. 1083 (Tex.Civ.App. 1922) aff'd (Tex.Com.App.), 269 S.W. 75, 39 A.L.R. 1247, on rehearing 272 S.W. 440, 39 A.L.R. 1247; Steed v. Petty, 65 Tex. 490 (1886); Blum v. Merchant, 58 Tex. 400 (1883); Hunt v. W.O.W. Life Ins. Co. Soc., Tex.Civ.App., 153 S.W.2d 857 (1941), writ ref.; Booth Fisheries Corp. v. Eardley, Tex.Civ.App., 233 S.W.2d 872 (1950), ref. n. r. e. Ordinarily the one (Chastain) against whom the estoppel operates is the one who is possessed of knowledge and who, by force of his knowledge, takes some advantage of him (Champlin) who does not have it. Hallmark v. United Fidelity Ins. Co., 155 Tex. 291, 286 S.W.2d 133 (1956); Humble Oil & Refining Co. v. Harrison, 146 Tex. 216, 205 S.W.2d 355 (1947); Burnett v. Atteberry, 105 Tex. 119, 145 S.W. 582 (1912); Moore v. Carey Bros. Oil Co., supra; 31 C.J.S. Estoppel § 70; 3 Pomeroy's Equity Jurisprudence, § 809 (5th ed). In this case, however, the majority has ruled that Champlin, possessed of full knowledge, may successfully invoke estoppel against Chastain who, the jury said was without knowledge.

In Hallmark v. United Fidelity Life Ins. Co., 155 Tex. 291, 286 S.W.2d 133 (1956), this rule is expressed:

"* * * It is generally essential to the application of the doctrine of equitable estoppel that the person claimed to be estopped shall have had full knowledge of the real facts at the time of his representation, concealment or other conduct relating thereto and al-

leged to constitute the basis of the estoppel. * * *"

Richey v. Miller, 142 Tex. 274, 177 S.W.2d 255, 170 A.L.R. 832 (1944), held that "an estoppel will not operate against a person who stands by and allows another to deal with his property when the person sought to be estopped has no knowledge of his interest in the property." In Colquitt v. Eureka Producing Co., (Tex.Com.App.), 63 S.W.2d 1018 (1933), Eureka asserted an estoppel against Colquitt. Eureka's agent in describing an oil assignment mistakenly included the gas also. The mistake was Eureka's since it was charged with its agent's knowledge. This knowledge by the one invoking estoppel defeated its defense of estoppel against Colquitt though he delayed in asserting his rights.

In Fitch v. Lomax, (Tex.Com.App.), 16 S.W.2d 530, 66 A.L.R. 758 (1929), Lomax and another sued Fitch on a written contract to recover certain funds. Unknown to Fitch and contrary to the actual agreement, the contract required Fitch to make certain refunds to Lomax. Lomax requested an issue that Fitch was estopped to deny the terms of the contract as actually written, and the court refused to submit it. Lomax urged that Fitch remained silent after he discovered that the agreement contained the provision contrary to the true agreement and that during this silence Lomax made substantial payments of the consideration. The Court held that Fitch owed Lomax no duty to speak under these circumstances, saying:

"* * * The jury having accepted Fitch's version that no such agreement was made, leaves the matter in the attitude that Henson and Lomax caused a provision to be inserted as a part of the consideration of the deed to which Fitch had not agreed. Under such circumstances, no duty devolved upon Fitch to notify Lomax and Henson of a fact of which they already had actual knowledge. Harrell v. City of Lufkin (Tex.Com.App.) 280 S.W. [174] 175;

Miller v. Babb (Tex.Com.App.) 263 S.W. 253.

"If Lomax and Henson deliberately caused this provision to be placed in the contract, knowing it had not been agreed to by Fitch, it would constitute actual fraud. If they caused it to be placed therein under the mistaken belief that it had been in fact agreed to by Fitch, it would constitute a constructive or legal fraud. It has been held that silence cannot be used as an estoppel to prevent a party from setting aside an instrument where its execution has been procured by fraud."

Hallmark v. United Fidelity Life Ins. Co., supra, says that the one estopped must have full knowledge. Williams v. Texas Employers Ins. Ass'n, 135 S.W.2d 262 (Tex. Civ.App.1940, writ ref.) says the same. Moore v. Carey Bros. Oil Co., 272 S.W. 440 (Tex.Com.App.1925), says " * * * it is indispensable that the party standing by and concealing his rights should be fully apprised of them." See Blum v. Merchant, 58 Tex. 400 (1883). No finding and no contention supports the idea that Champlin supplied that measure of knowledge to Chastain and until it did, there was no duty on Chastain to protest.

The majority opinion omits discussion of these settled principles and Texas authorities. Instead it cites and relies solely upon In re Shoemaker, 277 Pa. 424, 121 A. 510 (1923). The case is one in which several owners agreed to an operation of a coal mining venture as a unit. The trustee in charge determined that a change in distribution of proceeds was essential. Champlin should have done in this case what the trustee did in that case. Aside from the fact that in Shoemaker all parties agreed to operate the lease as a unit and here there was a contract between only Champlin and Chastain, the trustees wrote a forthright and direct letter explaining precisely what the changes would be and operations continued thereafter for eighteen years. The case proves my contention

because there was a full and fair disclosure as the law requires. See Stein Brothers and Boyce v. State Bank of Stearns, 255 Ky. 270, 73 S.W.2d 13 (1934); Alamitos Land Co. v. Texas Co., 11 Cal.App.2d 614, 54 P.2d 489 (1936); 29 A.L.R.2d 1034.

### Champlin Did Not Discharge Its Prior Duty

Champlin, as a matter of law, did not make a full and fair disclosure of its discovery. Champlin supplied Chastain with only two sources of information, the mimeographed letter written on September 12, 1958, and the monthly distribution statements. Neither satisfied Champlin's legal duty of full and fair disclosure. The letter is set forth in the majority opinion on page 380 and must be followed to understand how it disguised and obscured more than it revealed.

The letter began by artfully throwing Chastain off the scent. The first two paragraphs mention four audits by Humble Oil & Refining Company and Pan American Petroleum and allude to a 1948 agreement with Panola County Royalty Owners Association. Chastain knew that his contract mentioned and concerned none of those parties or periods of time. The audits covered a period of time that began six years before Chastain's contract. The Panola County Royalty Owners Association agreement was made eight years before Chastain's contract. Champlin's letter mentioned a letter from that association dated June 11, 1952. These earlier collateral negotiations with other entities were distractions and of no concern to Chastain, whose contract did not begin until October 25, 1956, and was with Champlin only.

The letter then said that a "question" had arisen about the language in the processing agreements and the actual procedure used by Champlin, which procedure was agreed upon by Panola County Royalty Owners Association and Champlin. The fact that there was a question between those parties was, of course, ignored. The third para-

graph emphasizes the Royalty Owners Association by mentioning it a third time. Surely the letter meant that those who had contracts with or through the Royalty Owners Association should take notice. This would not include Chastain but would throw him off guard.

The letter was misleading. It said: "Humble agrees with Champlin that this procedure * * * is most equitable and after reviewing the entire matter Pan American expressed no disagreement with the procedure." The beguiling inference is that those two producers had situations comparable to Chastain's. The truth was, and Champlin knew it, that the non-contract allocation used in the Champlin plant afforded both Humble and Pan American excessive allocations on the order of 1,000 barrels a month. Champlin, says the letter, also agreed that such a system was equitable. While Chastain was losing 4,217 barrels during a single month, Champlin was receiving an excess of 4,186. Champlin thought that was equitable.

The letter was a partial disclosure. It is undisputed that Champlin knew many things which it did not report. The letter did not state (1) that Champlin had innocently misrepresented its plant allocation system to Chastain; (2) that it had made allocations continuously from the inception of the Chastain contract in a way that violated its contractual duty, (3) at Chastain's great expense, but (4) to Champlin's advantage, (5) for one test month alone, Chastain was shorted 4,217 barrels while Champlin gained a windfall of 4,186 barrels; (6) that Champlin owed Chastain large sums of money; (7) what the actual plant allocation formula was; (8) how it varied from that which was spelled out in two pages in the Chastain contract; and (9) it did not include a copy of the early agreement with Panola County Royalty Owners Association. Champlin had all of this information and could have sent it to Chastain. Champlin's Vice-President testified that Champlin did not furnish Chastain with the description of the non-contract formula used by Champlin until it was attached to its pleadings six years after the date of the original contract.

We must discuss the majority's analysis of this letter. It begins by assuming that both Champlin and Chastain intended to receive products in line with an agreement between Panola County Royalty Owners and Champlin. Chastain's contract did not mention Panola County Royalty Owners. Chastain was not a royalty owner. His contract was made without regard to Royalty Owners. The opinion, to explain the clarity of the letter, helpfully inserts parenthetical explanations and terms that can not be found in the original contract. The majority opinion states that the Champlin letter advised it was "desirable that the same allocation formula be applied to all producers in the area." I do not find that language in the letter. Even so, what might be "desirable" is best expressed in the contract between the parties and Chastain felt secure in his. Chastain's rights were not measured by what is "desirable." Finally, the majority opinion says that the letter informed Chastain that it would continue to use the "plant formula." That term is one developed by the briefs after a long trial and is not in the letter. In short, the only way the obscure and misleading letter was or could be clarified was to call witnesses, have a trial, and reword it after the fact. This whole idea runs counter to the contract and letter between Champlain and Chastain during their contract negotiations in 1956. At that time Champlin wrote Chastain, "These contracts are somewhat flexible and may be altered to a specific condition and processing consideration." Agreements that Champlin might have with other producers and which might be affected were not mentioned until after this controversy arose.

Champlin's duty to purge itself of its innocent misrepresentation was not discharged by statements which created another substantially false impression. If a

corrective statement diverts the attention of the other party from the material facts or induces him to believe that the subject under discussion is trivial when it is not; or if the truth is disguised, hidden, or obscured so that the innocent party is put off his guard; the duty to correct is not discharged and the corrective statement becomes an active concealment. Wintz v. Morrison, 17 Tex. 372, 384, 67 Am.Dec. 658 (1856); Akers v. Martin, 110 Ky. 335, 61 S. W. 465 (1901); First National Bank of Manistee, Mich. v. Marshall & Ilsley Bank, 6 Cir., 83 F. 725 (1897); 3 Pomeroy's Equity Jurisprudence, § 901a (5th ed.). Though a statement may be literally true, it is actionable if made to create an impression substantially false. Cahill v. Readon, 85 Colo. 9, 273 P. 653 (1929). These principles are significant when the one who seeks relief through equity is the one who has made a misleading corrective statement.

In Wooley v. Chamberlain, 24 Vt. 270 (1852), Wooley sued Chamberlain and Flint to foreclose a mortgage executed by Chamberlain. Flint, another creditor of Chamberlain, also obtained a judgment against Chamberlain and levied on the land. Flint claimed that Wooley was estopped to deny his lien because Wooley had told his agent that he did not own any land in the area. Flint said he caused the levy to be made upon reliance on that statement. The Court held that the discussion between Flint's agent and Wooley, which was the basis of the claimed estoppel, was not focused upon the matter sufficiently to give rise to an estoppel against Wooley. This was so because Wooley's mind was not directed to the very point of the priority of Flint's mortgage upon the very lot in question and Wooley was not aware of any importance attached to his discussion. The Court wrote:

" * * * An estoppel of this kind is an equitable abandonment of a claim, a kind of perpetual disclaimer, and a party cannot be covertly led into it. It goes upon the ground of the obligation resting upon one owner, or part owner, of the property, to disclose the true state of his title to another, who is, or who is about to become, interested in the same thing. * * * The manner in which Lyman Ellsworth approached the orator was calculated, and was very obviously intended, to put Wooley off his guard, and lead him to suppose Ellsworth had, in fact, no interest in this particular land, but the contrary. The idea that one is to disclaim his rights beyond all recovery, without being made aware what he is doing, is certainly very far from the fair import of an estoppel in pais. We think the old doctrine that estoppels are odious might very justly be applied to one of this character, which one is to be made to incur covertly and, so to speak, by a kind of sleight of hand."

Champlin's final argument is that, though the letter did not tell Chastain the things it should have, it referred him to the monthly statements. Those reports do not purport to describe the distribution method. The argument is that within a short time after Chastain began producing, he received reports from which mathematicians could have unearthed the secrets it had not revealed. Champlin prepared all of these statements. Champlin's management, under all the evidence, did not discover its own accounting and distribution error until outside auditors for Humble disclosed it in August of 1958. The auditors for Humble and Pan American failed to find the error during four prior audits, but they did uncover the error in their fifth audit. Humble and Pan American promptly disclosed the whole truth to Champlin, but it still was not convinced until it made its own independent audit. Mr. Jones, the Vice-President, an engineer, and an employee of Champlin for eighteen years was called by Champlin to testify. As a part of Champlin's case and to prove its innocent

mistake, this occurred on direct examination and is not disputed:

"Q. Do you know when the mistake in that language was first discovered by Champlin?

A. Yes, sir.

Q. When was it?

A. Discovered as the result of the Humble and Pan American audit conducted in August of 1958.

\* \* \* \* \* \*

Q. When did you first learn of the mistake in this contract language?

A. In August, 1958.

Q. Do you know whether anybody else in the company knew about it before that time?

A. To my knowledge, no, they didn't; no one did."

For ten years Champlin was unable to discover from the reports it prepared, those things that the majority now says were sufficient to inform Chastain. Champlin requested issues[1] inquiring whether the monthly reports "showed the method of allocation used in computing the payments," and whether "Chastain acquiesced in the Champlin plant method of allocating plant products \* \* \* as used in the monthly production and disposition reports." The Court granted Champlin's requests and submitted the issues. The majority discussion about sufficiency of evidence to raise a jury issue assumes that the jury found favorably to Champlin that the monthly reports gave Chastain notice. The jury left the issues unanswered.

Skilled auditors for Humble and Pan American while making their fifth audit of Champlin's books and records learned and told Champlin about the meaning of the monthly reports. Champlin, still incredulous, undertook its own independent audit. According to Champlin's argument, it was then faced with a dilemma as to its course of action. Despite an entire decade of total ignorance on the part of Champlin itself, the author and distributor of every report, this Court has sustained its contention that the monthly reports made a full disclosure to Chastain. If Champlin was in total and innocent ignorance of the meaning of its own work product, should it in equity be heard to say that the product gave any more information to those who received it? The courts below have rejected Champlin's defense that it was ignorant but Chastain was informed. Because of Champlin's inequitable posture, I would do the same.

### The Jury Findings on Which Champlin Relies

Champlin holds to the finding on Special Issue 2 as the basis for reversing the courts below. The reason assigned is that there is some evidence to support the issue. Some evidence to support an immaterial issue is no basis for a judgment. The issue submitted was:

"Do you find from a preponderance of the evidence that the Plaintiffs, prior to the time when Chastain met John McNamara *could have discovered by the use of ordinary care* the allocation method used by the defendants was different from the allocation formula described in the Natural Gas

---

1. The following issues were unanswered:
    SPECIAL ISSUE NO. 6.
    "Do you find from a preponderance of the evidence that Champlin rendered monthly accountings to Chastain which showed the method of allocation used in computing the payments made by Champlin for the gas and liquids credited to the Chastain wells?"

SPECIAL ISSUE NO. 8.
"Do you find from a preponderance of the evidence that the Plaintiffs acquiesced in the Champlin plant method of allocating plant products to the producing wells as used in the monthly production and disposition reports?"

Processing Agreement?" (Emphasis added.)

The jury answered "Yes." The trial court properly disregarded the issue. Chastain objected to the issue because, among other reasons, the test, "could have discovered by the use of ordinary care," is the wrong test. If the majority approves that issue it should clearly say so. The opinion interchangeably mingles a variety of tests such as "could have discovered by the use of ordinary care," "could have ascertained," "could and should be imputed," "impute to Chastain * * * knowledge," "sufficient means of knowledge to charge him with notice," "if carefully examined would disclose." These tests leave the law in confusion. We do not even have a finding that Chastain *"should* have discovered by the exercise of ordinary care * * *." The finding is that he *"could have."* Of course, most things are possible, but possibility is neither negligence nor a lawful measure of duty. The finding is meaningless.

The legal authorities relied upon by the majority to support its galaxy of tests add further confusion. Love v. Barber, 17 Tex. 312 (1856) is cited. The quote states that one is estopped when he *"wilfully causes* another to believe the existence of a certain state of things." Gregg v. Wells, 113 Eng.Rep. 35 (1839) is quoted for the rule that one is estopped against a person "whom he has himself *assisted in deceiving."* Dimond v. Manheim, 61 Minn. 178, 63 N.W. 495 (1895) is quoted for the rule that "It is enough if the circumstances are such that a knowledge of the truth is *necessarily imputed* to him." Those indeed are the kind of cases in which equitable estoppel should operate. Applied, they mean that Chastain wilfully caused Champlin to believe he wanted to give Champlin $118,076.25, that Chastain deceived Champlin into believing he did not want the money, or that the hints and suggestions in the Champlin letter and the monthly reports necessarily imputed knowledge to Chastain that Champlin had overlooked for ten years.

The law on this point has been settled contrary to the majority opinion. While this case has been under submission, we have decided Fultz v. First National Bank in Graham, 388 S.W.2d 405 (Tex.1965). Fultz had an employee make his deposits with slips that were endorsed by Fultz "For Deposit Only." The employee, upon deposit, would withhold some of the funds by making deposits "less cash." We held that Fultz had a deposit contract with the bank upon which he could rely. We rejected the contention by the bank and the holding of the intermediate court that "negligence on the part of Fultz in not examining his bank statements and other records and discovering the defalcations so as to notify the bank would, if found to be true, constitute a defense * * *." The case stands for the rule that one who has a contract that clearly states the rights of the parties, may lawfully assume that the other contracting party is abiding by the agreement. Chastain was under no duty to assume that Champlin was breaching its contract, for the same reason that Fultz was not. We then said:

> "* * * [I]t was the clear and simple duty of the bank in the case here to honor the 'For Deposit Only' endorsement, and Fultz was not expected to know that the bank had not done so, or to anticipate that the bank might not do so, or to take measures to determine if the bank had done so.
>
> "Further, as recognized in Liberty State Bank, since Fultz owed no duty to the bank to examine his bank statements and other records, he was, for that reason, not guilty of negligence in not doing so, and in not discovering the defalcations of his employee. For the same reason he is not estopped to assert the liability of the bank. * * *"

Champlin has problems that exceeded even those in Fultz. It not only had the contract which it was breaching and the duty to make a full and fair disclosure upon discovery of its breach, it was under the handicap of an innocent misrepresentation of fact to Chastain. When Champlin discovered it was performing under the mistaken formula its duty was to speak, for to remain silent would be a tacit misrepresentation. McGinn v. McGinn, 50 R.I. 236, 146 A. 636 (1929). An innocent misrepresentation at the bargaining stage is actionable. Loper v. Robinson, 54 Tex. 510 (1881); Wilson v. Jones (Tex.Com.App.), 45 S.W.2d 572 (1932). The reason for this is that an innocent misrepresentation of a material fact creates a false impression the same as an intentional one. Powers v. Sunylan Co., (Tex.Com.App.), 25 S.W.2d 808, on rehearing 27 S.W.2d 129 (1930); Russell v. Industrial Transp. Co., 113 Tex. 441, 251 S.W. 1034, 51 A.L.R. 1, aff'd 113 Tex. 441, 258 S.W. 462 (1923); Pendarvis v. Gray, 41 Tex. 326, 329 (1847); Haldeman v. Chambers, 19 Tex. 1, 50 (1857).

In Buchanan v. Burnett, 102 Tex. 492, 119 S.W. 1141, 132 Am.St.Rep. 900 (1909), the Court held that a vendor, after making a misrepresentation about the title to his land, could not charge his vendee with negligence in failing to examine the abstract which admittedly the vendee had in his hands. Buchanan quoted from Labbe v. Corbett, 69 Tex. 503, 6 S.W. 808 (1888):

"*   *   *   ' "When once it is established that there has been any fraudulent misrepresentations, *   *   * by which a person has been induced to enter into a contract, it is no answer to his claim to be relieved from it to tell him that he might have known the truth by further inquiry. He has a right to retort upon his objector: 'You, at least, who have stated what is untrue *   *   * for the purpose of drawing me into a contract, cannot accuse me of want of caution, because I re-

lied implicitly upon your fairness and honesty.'" ' "

The defense of equitable estoppel has often been denied litigants who stand in a position similar to that of Champlin. The Court, in Hunt v. W. O. W. Life Ins. Soc., Tex.Civ.App., 153 S.W.2d 857 (1941) writ ref., wrote about a similar contention. "An applicant for insurance ought not to be relieved of the consequences of making false statements concerning his health by showing that the insurer could have discovered the falsity of the statements by making a medical examination of him. Such a thought is foreign to the recognized rules of equity." See also Liberty Mutual Ins. Co. v. First National Bank in Dallas, 151 Tex. 12, 245 S.W.2d 237 (1951); Liberty State Bank v. Guardian Savings & Loan Ass'n, 127 Tex. 311, 94 S.W.2d 133 (1936); Johnson v. Sugg, (Tex.Com.App.), 291 S.W. 857 (1927). Since Champlin's jury issue that Chastain "could have discovered" applied the wrong test, the finding is immaterial and the courts below correctly disregarded it.

### Findings Defeat Champlin's Defense of Equitable Estoppel

An essential element of Champlin's defense that Chastain was equitably estopped is a finding that it relied and was injured by reason of Chastain's silence after he was under a duty to speak. Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929 (1952); Waxahachie National Bank v. Beilharz, 94 Tex. 493, 62 S.W. 743 (1901). Special Issue 9 was unanswered and Special Issue 11 was answered against Champlin. They were:

SPECIAL ISSUE No. 9. "Do you find from a preponderance of the evidence that the Defendants acted in reliance upon the apparent acceptance, if any, by the Plaintiffs of Champlin's monthly accountings to them, by altering their position so that it would prejudice the Defendants to require a

reaccounting to the Plaintiffs?" (Unanswered).

SPECIAL ISSUE No. 11. "Do you find from a preponderance of the evidence that during the period of such delay the Defendants have changed their position in any way which would make it unjust for the Plaintiffs to assert such a claim now?" Answer "No."

Champlin requested Special Issue 11, and knew its effect when it moved the Court to disregard the answer and hold that "the defendants have changed their position in a way which would, as a matter of law, make it unjust for the plaintiffs to assert such a claim. * * *" Indeed, as Champlin recognized, this Court must hold that all the evidence shows that Champlin has changed its position. Champlin has done nothing but continue the breach of Chastain's contract. Apparently what Champlin means is that if Chastain had hastily complained, it would have begun abiding by its agreement. The jury probably thought so.

Champlin received about four or five barrels of the processed product out of every ten that were run through its plant. Giving effect to its stipulations, it could pay Chastain all it owes him without disturbing anyone. The argument that it could have recouped its losses from the other 164 suppliers is equally tenuous. After Champlin pays Chastain the $118,076.25 which it owes by force of a contract between those two, how it could pass that loss on to the other producers is difficult to determine. The proof does not divulge the kind of proceedings or the legal theory of liability of these other parties whose rights are measured by their own separate contracts with Champlin. The basis for this confusing argument by Champlin is the assumption that all parties were entitled to an aliquot part of the gas supplied the Champlin plant. The proof is that Champlin's rights and liabilities were measured by 165 separate contracts, and the rights of one were not governed by the contracts of others. In any event, the jury found against Champlin and that defeated their plea of equitable estoppel.

*Conclusion*

Champlin failed to prove its eligibility to relief in equity, because

(1) Chastain by the finding to the first special issue, was without actual knowledge of Champlin's mistaken distributions.

(2) Champlin had full prior knowledge of its continuing breach of contract which imposed upon it a duty to speak by making a full and fair disclosure of the material facts.

(3) It failed to prove that it discharged this duty, by failing to request an issue. The trial court's implied finding is now against Champlin.

(4) As a matter of law, Champlin did not make a full and fair disclosure of the material facts but made a misleading and partial disclosure.

(5) The jury found that Champlin did not change its position in any way which would make it unjust for Chastain to assert his claim.

(6) As a matter of law, Champlin has proved no injury other than its liability upon the contract with Chastain.

I would affirm the judgment of the Court of Civil Appeals.

CALVERT, C. J., and GRIFFIN and WALKER, JJ., join in this dissent.

On Rehearing

NORVELL, Justice.

After due consideration of respondents' motion for rehearing, we adhere to our holding that the trial court erred in granting respondents' motion to disregard the

jury's answers to Special Issues Nos. 2, 3, 4 and 5 (Rule 301, Texas Rules of Civil Procedure) [1], but have reached the conclusion that in the interest of justice, this cause should be remanded to the District Court for another trial. Consequently, our order of remand to the Court of Civil Appeals is set aside and this cause is remanded to the trial court.

As indicated in the original opinion, the petitioner Champlin, in addition to estoppel, pleaded a number of defenses to the cause of action asserted by the respondents, such as reformation, stated account, laches, acquiescence, etc. Some of these defenses were somewhat similar in nature to the estoppel defense and certain of the issues relating to such defenses were not answered. The trial judge also submitted a number of issues which were evidentiary in nature. The controlling estoppel issues, however, were Nos. 1, 2, 3, 4 and 5. In relation to such defense and findings, the following dates are of importance: October 25, 1956, the date of the Natural Gas Processing Agreement which contained the contract allocation formula; September 12, 1958, the date of the Champlin letter written shortly after the completion of the Humble audit; and March 1961, when Chastain met with John McNamara and Dick Castleberry in Dallas, Texas and was told by them that there was a substantial difference between the plant formula being used by Champlin and the contract formula. The time inquired about in the estoppel issues was the period extending from October 1956, when the contract was executed, to March 1961, when Chastain met with McNamara. The period emphasized by the evidence was the period from September 12, 1958 to March 1961.

The record discloses that prior to March 1961, Chastain had two possible sources of knowledge that the plant formula and the contract formula were not identical. These were the monthly statements rendered by Champlin to Chastain and Champlin's letter of September 12, 1958. The jury returned no answers to the issues submitted to the jury upon whether or not a stated account arose from the statements alone, but under the wording of the estoppel issues, the jury was allowed to consider the statements rendered by Champlin in the light of whatever notice the letter of September 12, 1958 may have given to Chastain.

■■■■ Had the jury answered Special Issue No. 1 in the affirmative, we would have no hesitancy in saying that Chastain would be estopped from asserting a claim that the contract formula was different from the plant formula. This issue inquired if Chastain had actual *knowledge* of a difference between the contract formula and the plant formula. See, 2 Pomeroy, Equity Jurisprudence (5th Ed.) 603, § 592, Knowledge and Notice Distinguished. However, Issue No. 1 was answered in the negative so Champlin must of necessity rely upon Special Issue No. 2 to support its estoppel defense. Ordinarily, when one contracting party discovers or becomes aware of a fact or circumstance affecting the contract, he must make disclosure of such fact or circumstance to the second contracting party before he may assert an estoppel based upon the non-action of the second party. If full disclosure be made, an estoppel could arise under certain circumstances, even though the second party by inattention, neglect or wanton carelessness, failed to realize the situation and act accordingly. On the other hand, if the second party (the one against whom the estoppel is asserted) has knowledge or information of facts sufficient to put him upon inquiry which if reasonably pursued would lead to the discovery of the controlling fact,—in this instance, the use of the plant alloca-

1. Special Issues Nos. 10 and 12 were also attacked in this motion. By its answers to these issues, the jury found that Chastain delayed in asserting a claim against Champlin, etc., and that Champlin had distributed to the Chastain wells the amount of liquids produced by such wells.

tion formula,—said second party is in effect charged with actual knowledge of such controlling fact because the circumstances are such that notice of such fact is necessarily imputed to him. 2 Pomeroy's Equity Jurisprudence (5th Ed.) 613, § 596. Such notice is imputed actual notice and will support an estoppel. "[A]ctual notice is a conclusion of fact, capable of being established by all grades of legitimate evidence." 2 Pomeroy, Equity Jurisprudence (5th Ed.) 612, § 595. It is Chastain's position that the letter of September 12, 1958, coupled with the monthly reports submitted to him by Champlin, were insufficient as a matter of law to impute knowledge to him that Champlin was allocating mineral substances to him on a basis other than that prescribed in the contract. We think the evidence presents an issue of fact for a jury.

The doctrine of equitable estoppel may have application to a variety of fact situations. See, 3 Pomeroy, Equity Jurisprudence (5th Ed.) 190, § 805. Consequently, each case must to a considerable extent stand upon its own facts. Here as pointed out in the original opinion, the letter of September 12, 1958 informed Chastain of Champlin's intention "to continue to employ the aforementioned procedure (of allocation) as to all producers connected with our plant". Champlin also offered to discuss the matter with Chastain or any other operator producing to the plant and then stated that, "Unless we hear from you to the contrary within thirty (30) days, we will consider that our suggestion for continuing this procedure meets with your approval." It would seem that this information would call upon Chastain for a re-examination of his position. He and Champlin were engaged in a business relationship which involved a month to month accounting by Champlin to Chastain. Inquiry was made of Chastain as to whether or not he was satisfied with the allocation processes then being used by the Champlin plant. The statement of any objection to a continuation of the operating and accounting procedures was suggested and called for. Depending upon a jury's estimate of the information set forth in the Champlin letter, it could be concluded that Chastain was under a duty to speak. "An estoppel may arise as effectually from silence, where it is a duty to speak, as from words spoken." Burnett v. Atteberry, 105 Tex. 119, 145 S.W. 582, l. c. 587 (1912). Cf. Humble Oil & Refining Co. v. Harrison, 146 Tex. 216, 205 S.W.2d 355 (1947).

In Weinstein v. National Bank of Jefferson, 69 Tex. 38, 6 S.W. 171 (1887), it was held that a bank depositor was precluded from asserting that certain checks were forgeries because of his silence and failure to notify the bank of such forgeries within a reasonable time. Mr. Justice Gaines, speaking for this Court, said:

"The banker impliedly says to the depositor: 'This is my account. Examine it, and, if not found correct, report to me its inaccuracies.' And should the latter fail to complain within a reasonable time, the banker would have the right to consider that there was no objection to it. By his failure to speak in proper time, he virtually admits the correctness of the items charged. It is now held that an estoppel may be created, not only when the party sought to be concluded knows the material facts he is charged with having represented or concealed, but also when he is 'in such position that he ought to have known them, so that knowledge will be imputed to him.' 2 Pom.Eq.Jur. § 809. Here it is the duty of the depositor to know whether the account is correct or not, and, promptly to report a forgery when detected. Should he negligently fail to make the examination and consequent discovery, (when he could have discovered it,) it is as if he had expressly admitted the genuineness of the checks, and he will not be permitted to deny the fact, provided the bank be prejudiced by his failure. * * *"

The issue of imputed actual knowledge was submitted to the jury by means of

Special Issue No. 2, inquiring if Chastain could have discovered by the use of ordinary care that the method used by Champlin was different from the contract formula. While the wording of the issue is not patently or substantially erroneous, a more accurate statement of the test would be to inquire if Chastain prior to March 1, 1961, was in possession of information which would cause a reasonably prudent man, similarly situated to Chastain, to make inquiry, which inquiry if pursued with ordinary diligence would have disclosed that the plant formula in actual use was a different formula from that prescribed in the Natural Gas Processing contract.

█ While numerous objections to Special Issue No. 2 were filed, predicated for the most part upon the assertions that the issue was immaterial or that the evidence did not raise the issue of imputed actual notice, there was no objection to the wording of the issue in the particular here discussed. Cf. Allen v. American National Insurance Company, 380 S.W.2d 604 (Tex. Sup.1964). However, in view of our reversal, we are of the opinion that the case should be remanded to the District Court for another trial rather than remanded to the Court of Civil Appeals as originally ordered. In this way, a more nearly accurate inquiry relating to the theory of imputed actual notice may be framed and the jury submission simplified in other particulars, as it appears that some confusion in the jurors' minds may have resulted from the submission of certain evidentiary issues as well as from the wording of some of the issues relating to defenses similar in nature to that of estoppel.

What we have said is based upon the record of this case. The jury submission upon another trial will of course be controlled by the evidence received by the court at that time, which may or may not raise issues in addition to that of estoppel.

Respondents' motion for rehearing is granted to the extent herein indicated, otherwise it is overruled.

Motion for rehearing granted in part and overruled in part.

On Rehearing

CALVERT, Justice (dissenting).

Reversal has been ordered by the Court because of its conclusion that Champlin was entitled to judgment based on the jury's answers to Special Issues 2, 3, 4 and 5, the estoppel issues. I do not agree that these findings furnish a sound basis for judgment in Champlin's favor.

Reversal is ordered upon a holding that one may be estopped from asserting his rights because he was silent when he had a duty to speak. One cannot quarrel with that general rule or with its soundness. The crucial inquiry in this case is whether Chastain was under a duty to speak when he was silent.

The holding of the Court is that Chastain was under a duty to speak upon receipt of Champlin's letter if a jury should find that Chastain was then "in possession of information which would cause a reasonably prudent man, similarly situated to Chastain, to make inquiry, which inquiry, if pursued with ordinary diligence, would have disclosed that the plant formula in actual use was a different formula from that prescribed in the Natural Gas Processing contract." Aside from the fact that that is not the issue submitted in this case on which Champlin obtained a favorable finding, a matter to which I will refer later, I suggest that the holding has no support in the case law of this State and that it will extend the defense of estoppel by silence far beyond any rational philosophical basis.

The true basis of estoppel by silence is deceit. One cannot be guilty of deceit by silence if he has no knowledge of the facts which the law requires him to disclose. In Burnett v. Atteberry, 105 Tex. 119, 145 S. W. 582 (1912), cited in the Court's opinion, the party held to be estopped by silence had

*actual knowledge* [1] of his rights. In the course of our opinion in that case we quoted from Mr. Bigelow as follows: "A representation in the nature of a negative of one's rights may, as we have seen, arise from pure silence; and from pure but *misleading* [2] silence *with knowledge* * * * an estoppel will arise." 145 S.W. 587. We also quoted from Lord Denman in Pickard v. Sears, as follows: "A party who negligently or culpably stands by and allows another to contract on the faith and understanding of a fact *which he can contradict* cannot afterwards dispute that fact in an action against the person whom he has himself assisted in deceiving." 145 S.W. 587. We also quoted Chancellor Kent as declaring in Wendell v. Van Rensselaer, 1 Johns Ch. (N.Y.) 353, that the act of one who "knowingly" permits another to act to his prejudice is *"an act of fraud* and injustice." 145 S.W. 587.

In an even earlier case, Burleson v. Burleson, 28 Tex. 383, 415–416 (1866), we stated the rule as follows:

"The effect of an *estoppel in pais* is to prevent the assertion of an unequivocal right, or preclude a good defense, *and justice demands that it should not be enforced unless substantiated in every particular.* Carpenter v. Stilwell 12 Barb. [N.Y.] 128. The ground upon which the estoppel proceeds is fraud, actual and constructive, on the part of the person sought to be estopped. What will amount to the suggestion of a falsehood, or the suppression of the truth, may be difficult to determine in all cases; but *some turpitude, some inexcusable wrong, that constituted the direct motive, or induced the outlay or purchase, is necessary to give silence or acquiescence the force of an estoppel in pais.* Hence, the ignorance of the true state of the title on the part of the purchaser must concur with willful misrepresentation or concealment on the part of the person estopped. * * *

"The true doctrine is well expressed in Story, Eq. § 386. In order to apply an estoppel, it is indispensable that the party standing by and concealing his rights *should be fully apprised of them,* and should, by his conduct or gross neglect, encourage or influence a purchaser; for *if he be wholly ignorant of his rights,* or the purchaser know them, or if his acts, silence, or negligence do not mislead or in any manner affect the transaction, there can be no just inference of actual or constructive fraud on his part. Rights can be lost or forfeited only by such conduct as would make it fraudulent and against conscience to assert them."

W. S. Simkins in his great work on Equity, 2d Ed., p. 674, sums up his discussion of estoppel in these words: "To sum up the matter, then, we have the basis of estoppel succinctly stated as follows: First. It arises where there is ignorance and acts. [Cases cited] Second. Where there is *knowledge and silence.* [Cases cited] And sometimes presence and silence, as we have seen. [Cases cited] *But not silence and ignorance.* [Cases cited]"

It seems to me that the foregoing clearly defined expressions of the law in this State should have more controlling effect on our decision in this case and in charting our future course than should vague, contradictory, and generalized statements from American Jurisprudence and Corpus Juris Secundum.

It is enough to rest a duty to speak upon *actual knowledge* or *knowledge imputed as a matter of law.* In support of its holding the Court quotes extensively from Weinstein v. National Bank, 69 Tex. 38, 6 S.W. 171 (1887). That case does not support the holding made in this case. In the first place, that case relates to the relationship

---

1. Emphasis mine unless otherwise indicated.

2. Emphasis the author's.

between a bank and its depositors concerning forged checks. In the second place, close analysis of the facts and of the Court's holding will clearly disclose that the estoppel was predicated upon *knowledge imputed as a matter of law*; the only question left to the jury was the question of injury to the bank.

Mr. Justice Pope has cited a number of Texas decisions in his dissenting opinion in which our courts have declared that a duty to speak arises out of actual knowledge of the facts. See Hallmark v. United Fidelity Life Ins. Co., 155 Tex. 291, 286 S.W.2d 133 (1956); Williams v. Texas Employers Ins. Ass'n, Tex.Civ.App., 135 S.W.2d 262 (1940), writ refused; Moore v. Carey Bros. Oil Co., Tex.Com.App., 272 S.W. 440, 39 A.L.R. 1247 (1925). Pomeroy states the rule thusly (3 Pomeroy, 5th Ed., 216, § 809):

> "The truth concerning these material facts represented or concealed must be known to the party at the time when his conduct, which amounts to a representation or concealment, takes place; *or else the circumstances must be such that a knowledge of the truth is necessarily imputed to him.*" [3]

I can agree that a duty to speak should be imposed upon one to whom knowledge *is necessarily imputed*—imputed as a matter of law. Thus one would have a duty to speak of matters in his chain of title, of matters known to his agent, etc. But I cannot agree that one should have a duty, imposed *ex post facto* by a jury finding, to speak of matters which he did not know but which he might have discovered if he had followed tenuous leads to knowledge. The rule adopted by the Court does more than impose a duty to speak; it imposes a preliminary duty to be wary, suspicious and distrustful. It does more than punish those who with knowledge of their rights are by their silence deceitful; it punishes those

who are not alert to the fact that others may be deceiving them about their rights. This, I say, is extending the defense of estoppel far beyond the sound philosophical basis upon which it was founded by equity to prevent injustice; it perpetrates injustice. Once the rule laid down by the Court is adopted, our courts will be confronted constantly with the unsatisfactory and uncertain business of deciding whether there is any evidence of probative force to support the jury finding which imposes the duty and whether the finding of fact which imposes the duty is against the weight and preponderance of the evidence.

The issue actually submitted upon which the Court holds that Champlin was entitled to judgment inquired only if the plaintiffs "could have discovered by the use of ordinary care" that the allocation method used by Champlin was different from that described in the contract. That issue is far different from the one the Court now says should be submitted. Yet the Court states that Champlin was nevertheless entitled to judgment on the jury's affirmative answer because "there was no objection to the wording of the issue in the particular here discussed." It seems to me that one of the plaintiffs' objections went directly to the heart of the matter. The objection follows:

> "Plaintiffs object to Special Issue No. 2 on the grounds that such issue is immaterial because by inquiring whether Plaintiffs 'could' have discovered, by the use of ordinary care, that the allocation method used by Defendants was different from the allocation formula described in the Natural Gas Processing Agreement said issue in effect inquires whether it was possible, by the use of ordinary care, for the Plaintiffs to have discovered prior to the time Chastain met John McNamara that the allocation method used by Defendants was different from the allocation formula described in the Natural Gas Processing Agreement, and

---

3. Emphasis the author's.

whether Plaintiffs 'could' have made such discovery is not material."

Plaintiffs by the quoted objection pointed to the fatal flaw in the issue. The issue was Champlin's issue, and the plaintiffs owed no duty under the Rules of Civil Procedure to prepare and submit a correctly worded issue or to tell the court how to word the issue correctly. Rule 274. The question is not controlled by Allen v. American National Ins. Co., Tex.Sup., 380 S.W.2d 604 (1964). In that case there was no objection to the incorrectly worded issue.

There is one other matter to which I would direct attention. The Court of Civil Appeals concluded that Champlin could not use the findings to issues 2, 3, 4, and 5 to estop Chastain from asserting his clear legal right to a recovery because as a matter of law Champlin was not in court with clean hands—it had not made a full and fair disclosure to Chastain of facts known to it concerning his rights. This Court has disagreed with that conclusion. It is noticeable, however, that the Court has *not* held that the letter written by Champlin made a full and fair disclosure as a matter of law, and inferentially the Court recognizes that whether the letter did or did not do so is an issuable fact. Having reached that point, the Court omits further discussion of the problem. Inasmuch as the case must be retried, the problem should be clarified.

I apprehend that "clean hands" is not an affirmative defense to a plea of estoppel; it is a necessary predicate for the plea, and if it is an issuable fact under the evidence, the burden of obtaining a favorable finding is on the party asserting an estoppel. It is thus but one of the cluster of issues essential to the defense of estoppel.

GRIFFIN, WALKER and POPE, JJ., join in this dissent.