Michael E. **RUSSELL,** et al., Appellants,

v.

**PANHANDLE PRODUCING COMPANY, Appellee.**

No. 07–97–0077–CV.

Court of Appeals of Texas, Amarillo.

Aug. 10, 1998.

Rehearing Overruled Oct. 5, 1998.

---

**13.** *Id.* at 473.

**14.** 607 S.W.2d 258 (Tex.Civ.App.-Texarkana 1980, writ dism'd).

**15.** *Id.* at 266.

Mullin Hoard & Brown, John Mozola, Amarillo, Sprouse Smith & Rowley, Matthew McCann, Amarillo, Michael Pullara, Houston, for appellants.

Cox & Smith Inc., Kevin M. Beiter, Richard T. Brady, Margaret P. Sullivan, San Antonio, The Underwood Firm, James A. Besselman, Amarillo, for appellee.

Before BOYD, C.J., and QUINN and REAVIS, JJ.

REAVIS, Justice.

This is an appeal from a take nothing summary judgment. Appellants are nineteen working interest owners of an oil and gas lease in Hutchinson County known as the Bearkiller lease. They filed this suit in Potter County to recover contract damages based upon the alleged breach of a gas purchase and sales agreement which was entered into by and between appellee, Panhandle Producing Company (Panhandle) and W.R. Edwards Jr. (Edwards), the prior owner of the lease. The trial court granted summary judgment in favor of Panhandle and appellants brought this appeal. By ten points of error, they contend the trial court erred in granting summary judgment in favor of Panhandle, and in denying their motion for partial summary judgment. Panhandle presents one conditional cross-point contending the trial court erred in denying its motion to transfer venue to Bexar County. Based upon the rationale and authorities expressed herein, we reverse the summary judgment and remand the cause to the trial court for transfer to Bexar County.

## PARTIES

Collectively, appellants are herein referred to as "sellers." However, because some of the sellers joined as plaintiffs by amended petitions, and because limitations questions are presented, we have divided the sellers into groups based upon the dates they joined the lawsuit.

On April 22, 1992, appellants Michael A. Russell, Jack Ramey, Wayne Snider, Sandra S. Christner, Tabor Scott, the Noban Group (its members being Frank Baughman, Harold Ochsner, Dan Neely and Ben Neely), Glenn McMennamy, S & J Investments, and American Star Energy and Minerals Corporation (American Star), herein collectively referred to as the "Russell Group," filed their original petition. On August 19, 1992, appellants Catherine C. Campisi, Paul Coble Klein, K.K. Davidson, Richard P. Klein, Helen Reynolds and David Walker, herein collectively referred to as the "Campisi Group," joined the "Russell Group" as plaintiffs upon the filing of the first amended petition. On February 14, 1994, appellant Judy Walker, joined as a plaintiff upon the filing of the fourth amended petition.

On February 14, 1995, Edwards filed a plea in intervention but, upon Panhandle's motion in opposition, the trial court disallowed his intervention. Edwards was therefore not a party to the lawsuit and is not a party to this appeal.

## HISTORY

On January 12, 1981, Edwards, who was then the owner of the Bearkiller oil and gas lease in Hutchinson County, entered into a written contract prepared by Panhandle, (hereafter referred to as the Edwards contract) in which he agreed to sell, and Panhandle agreed to buy, casinghead gas produced from 22 wells on the lease.[1] The relevant provisions of the Edwards contract are summarized as follows:

- The seller agreed "to sell and deliver into buyer's gathering line the maximum allowable production of each well, for the life of the leases."

- Seller shall deliver the gas at a point or points below seller's separators, compressors or lines of pipe, at which point or points, "title to the gas and all components thereof shall pass to and vest in Buyer."

- Article IV specified the quality of the gas. Article V entitled "Quality Tests" provided that (a) an initial quality test for BTU content would be made; (b) subsequent tests for quality could be made by either party at its election and cost; and (c) the results of the last prior test remained controlling until a subsequent test was conducted.

- Article VI entitled "Measurement" provided for gas measurement. In summary it provided that (a) the meter or meters would be furnished, installed and kept in repair by Panhandle; (b) either party could request that the meter or meters be tested to determine accuracy and that a registration within two percent would be considered correct; (c) any inaccurate equipment was to be restored by Buyer to a condition of accuracy; and (d) settlement for any periods of inoperation or inaccurate measurement shall be estimated per specific provisions.

- Article XI provided that the contract was to remain in effect for the life of the lease; however Article XV (hereafter referred to as the *unprofitable clause*) provided that "Buyer shall not be required to continue taking gas from, and Buyer shall have the right to disconnect from, any well of Seller when, in the Buyer's sole judgment, such connection is no longer profitable to Buyer."

- Article VII, entitled Price and Payment, provided that (a) the initial price is to be 90% of the maximum lawful price per the Natural Gas Policy Act (NGPA); (b) in the event the NGPA no longer applies, the price of gas is to be the *price in effect* during the last month in which the NGPA applies (hereafter the *price in effect* provision); and (c) "Each party hereto shall have the right at all reasonable times to examine the books and records of the other party to the extent necessary to verify the accuracy of any statement, charge, computation or demand made under or pursuant to the contract. Any statement shall be final as to both parties unless questioned within two (2) years after payment thereof has been made."

Having the duty to deliver the gas to Panhandle, Edwards installed a gathering system to deliver casinghead gas from 22 oil wells to a point off the lease where the gas was metered by Panhandle. After the gas was separately metered, it flowed into Panhandle's pipeline, known as the "Riemer System," where it was commingled with gas from six other leases and sold to Phillips 66 Natural Gas Company (Phillips).

Around the same time the Edwards contract was consummated, Edwards made a partial assignment of his working interest in the lease. Although Edwards's partial assignment of the working interest to some of the sellers was dated December 24, 1980, it was not recorded until June 4, 1981.[2]

---

1. Because the parties neither assert that the contract was recorded, nor make reference to any official public record showing that it was recorded, and because the contract does not show any official recording data, we treat the contract as unrecorded for purposes of our analysis.

2. We describe the instrument as a partial assignment, but it is a combination assignment and agreement, signed and bearing notary acknowledgments for Edwards and all assignees. Although dated December 24, 1980, the date of acknowledgment for Edwards's signature was

**706**

## 1985 PRICE AMENDMENT

By letter of June 14, 1985, Panhandle notified Edwards that due to a dramatic decline in the price for gas, it would cease taking gas deliveries under the Edwards contract on July 1, 1985 unless Edwards agreed to a reduced price of $2.40 per Mcf. To support its invocation of the unprofitable clause, Panhandle claimed the original contract price was, and had been, well above market levels, while the costs of gathering gas continued to escalate. Moreover, the letter stated that Panhandle had been forced to yield to price and "take" concessions demanded by the down stream purchaser of residue gas. By letter of June 27, 1985, Tabor Scott, Edwards's attorney, and a member of the Russell Group, advised Panhandle that Edwards agreed to the requested price reduction on a day-to-day basis, but that Edwards reserved the right to sell the gas to any other buyer.

Thereafter, for reasons not explained in the record or briefs, the Russell Group and the Campisi Group, except Richard P. Kline, K.K. Davidson, and Judy Walker, signed division orders to Panhandle effective October 10, 1986. Among other things, by signing the division orders, those parties expressly ratified the Edwards contract as amended, providing for a price of $2.40 per Mcf effective July 1, 1985.

## 1987 PRICE REDUCTION

In February 1987, Phillips notified Panhandle that it was terminating their contract because it was no longer profitable for Phillips to purchase gas from Panhandle at their agreed rate. Thereafter, by letter of April 13, 1987, Panhandle gave the sellers written notice of its intention to again invoke the unprofitable clause and to terminate the Edwards contract unless its proposed price of $1.65 per Mcf was accepted. Attorney Scott advised Panhandle by letter of April 28, 1987, that he and his unnamed clients (some of the sellers) agreed to the reduced price of a $1.65 per Mcf, on a day-to-day basis. On June 12,

1987, attorney Scott sent Panhandle a copy of a June 12, 1987 letter which he had sent to all sellers. According to Scott's letters, 70% of the sellers met to discuss: (1) the fact that the Bearkiller lease had not been operating since May 1, 1987, (2) that an operator needed to be appointed, and that all sellers needed to pay their share of the operating expense, and (3) problems with the gas market and Panhandle's request for a price reduction to $1.65 per Mcf. In his letter to the sellers, attorney Scott stated that, "[n]o other producers in the area are willing to purchase the gas at a price equal to this. Though nobody likes the price of gas, we must speculate that the price now is low and could be higher within a year, but at least we will be able to renegotiate the gas price within one year."

By his letter of June 12, 1987 to Panhandle, attorney Scott advised Panhandle that "[i]t is the desire of the 70% ownership which I represent to get this lease back on line, sell its gas to you under the terms which you proposed, (i.e. $1.65 per Mcf for one year). I hope my letter to the interest owners will bring a positive result from the 30%." This letter was followed by another letter from Scott to Panhandle dated July 28, 1987, advising that 17 of the 19 sellers had agreed to the new price. By their pleadings and briefs, sellers and Panhandle acknowledge, subject to their other claims and contentions, that all sellers agreed to the 1987 price reduction to $1.65 per Mcf commencing May 1, 1987, however there is uncertainty and a dispute as to the effective price commencing May 1, 1988.

Although the record is incomplete, it appears that Omega Energy took over lease operations, but resigned as operator effective November 1, 1987. Thereafter, American Star took over as operator with knowledge that problems regarding the gas purchase contract, disbursements, and other matters "had not been resolved," and that Panhandle had proposed a replacement gas purchase contract in November.[3]

March 2, 1981. Acknowledgments for the assignees are dated both before and after March 2, 1981. The instrument contains no references to the Edwards contract with Panhandle. By the instrument, Edwards reserved an overriding royalty interest and a "back-in" working interest.

3. American Star's knowledge of these problems is evidenced by its letter to Panhandle dated December 21, 1987.

On January 12, 1988, Burnaby Enterprises, Inc. (Burnaby) acquired by assignment Edwards's remaining working interest which had not previously been assigned. Thereafter, on November 1, 1988, Burnaby signed a new gas purchase contract with Panhandle for $1.65 per Mcf, effective January 5, 1988.[4] On July 12, 1990, Burnaby then assigned its working interest to American Star, which by this time had been serving as operator for nearly three years. The assignment providing in part that it was subject to "other **burdens** upon the assigned oil and gas leasehold interest." (Emphasis added).

After American Star took over operations, by letter of March 28, 1988, it sent Panhandle documentation from Omega Energy and the sellers, authorizing Panhandle to release to American Star gas sales proceeds held in suspense since May 1, 1987. Then, by letter of April 29, 1988, Panhandle advised the sellers that it had released the money held in suspense since May 1, 1987, to American Star and concluded that, effective May 1, 1988, Panhandle would continue to remit to the operator based on a price of $1.65 per Mcf for gas tendered to Panhandle. Also, by the same letter, Panhandle acknowledged that some of the sellers had approved the Panhandle letter of April 13, 1987, which did not contain a one year limitation, and that others had approved, by other documentation, the $1.65 per Mcf price for only one year.

After Panhandle distributed the suspended funds, by letter of February 3, 1989, American Star requested a payment of $42,519.78 from Panhandle because of escalated gas prices under the Edwards contract. Correspondence continued between American Star and Panhandle including a letter of American Star dated December 3, 1990, citing better gas prices, and giving notice of the termination of the Edwards contract. Also by letter dated February 19, 1991, American Star in relevant part: (1) acknowledged the June 1985 price reduction, (2) acknowledged the price of gas was deregulated on July 1, 1987, (3) acknowledged the sellers had agreed to the 1987 price reduction to $1.65 per Mcf for one year ending May 1, 1988, and (4) advised Panhandle that "the amended price of $1.65 per Mcf was terminated, and the gas was now priced at $3.881 per MMBtu."[5] Correspondence continued without any resolution, eventually leading to the commencement of this action by the Russell Group on April 22, 1992.

By their sixth amended petition, the sellers sought to set aside, or avoid, the 1985 and 1987 price reductions on a variety of grounds, and sought recovery based upon the original pricing provisions of the Edwards contract. Also, the sellers alleged conversion and sought to recover payment for gas which they alleged was delivered to Panhandle but for which Panhandle did not pay.

On August 23, 1994, the trial court heard sellers' and Panhandle's motions for summary judgment along with their respective evidence, responses and objections thereto. On July 12, 1996, the trial court, without identifying specific grounds, denied sellers' motion and amended motion for partial summary judgment, and granted Panhandle's motion and amended motion for summary judgment as to all of sellers' claims. The final judgment was signed on February 3, 1997.

By three points of error, sellers contend the trial court erred in denying their motion for partial summary judgment. By seven additional points, sellers contend the trial court erred in granting Panhandle's motion for summary judgment and rendering judgment that sellers take nothing by their action. In addition to reply points, Panhandle presents one conditional cross-point contending, in the event of a reversal, that the trial court erred in denying Panhandle's motion to transfer venue and that upon remand, the cause should be transferred to a district court in Bexar County.

Normally, we would address the venue issue first. However, because the issue is

**4.** The contract, which provided that it would be binding on Burnaby's assigns, did not limit the $1.65 price to a one year time period.

**5.** The February 19, 1991 letter did not make any reference to the contract between Burnaby and Panhandle dated November 1, 1988, but effective January 5, 1988.

raised in a cross-point conditioned upon a reversal we first determine if any of sellers' points present reversible error. Because, as explained below, we hold that sellers' first and fourth points of error (being presented jointly), must be sustained in part, a reversal is required. We therefore limit our review to appellants' first and fourth points of error and Panhandle's cross-point.

## SUMMARY JUDGMENT STANDARD OF REVIEW

■ The question on appeal from a summary judgment is not whether the evidence raises a fact issue on the essential elements, but whether the evidence establishes as a matter of law that there is no genuine issue of material fact. Tex.R. Civ. P. 166a(c); *Rodriguez v. Naylor Industries, Inc.*, 763 S.W.2d 411, 412 (Tex.1989). Where, as here, both parties seek summary judgment, each party must carry its own burden as the movant and neither party can prevail simply by the other party's failure to discharge its burden. *Tigner v. First National Bank of Angleton*, 153 Tex. 69, 264 S.W.2d 85, 87 (1954). When both motions are before it, the trial court may consider all of the evidence in deciding whether to grant either motion, *Dallas County Appraisal Dist. v. Institute for Aerobics Research*, 766 S.W.2d 318, 319 (Tex.App.—Dallas 1989, writ denied), and may rely upon one party's evidence to supply missing proof in the other party's motion. *DeBord v. Muller*, 446 S.W.2d 299, 301 (Tex. 1969).

■ In our review of the trial court's determination, we take all evidence favorable to the losing party as true, *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex.1986), every reasonable inference is indulged in favor of the losing party, and any reasonable doubt is resolved in its favor. *Id.* When, as here, both parties file motions for summary judgment, and one is granted and the other overruled, we determine all questions necessary to disposition, including the propriety of the order overruling the losing party's motion, where such is necessary for disposition. *Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex. 1988).

## GAS SOLD AFTER MAY 1, 1988

■ One of the grounds asserted by Panhandle in its motion for summary judgment was that sellers' breach of contract claim was barred by the four-year statute of limitations. By their first and fourth points of error, sellers contend the trial court erred in holding their action barred by the four-year statute of limitations. By sub-point one, sellers contend the statute of limitations did not bar their claims arising during the four years immediately prior to suit. Additionally, by sub-points two, three and four, they assert that limitations did not apply because of fraudulent concealment and the discovery rule. They also contend that Article VII.5 of the Edwards contract was not specific enough to modify the four-year statute of limitations into a two-year limitations period. Based upon the evidence mentioned below, we need address only sub-point one to determine the applicability of the statute of limitations to sellers' claims for gas delivered and sold after May 1, 1988.

Initially, it bears noting that an interest in an oil and gas lease is deemed to be an interest in real estate, and that before gas is produced and brought to the surface, it is real property. *Westland Oil Development Corp. v. Gulf Oil*, 637 S.W.2d 903, 908 (Tex. 1982); *Consolidated Gas & Equipment Co. v. Thompson*, 405 S.W.2d 333, 336 (Tex.1966). Before the adoption of the Business and Commerce Code, the applicability of the four-year statute of limitations was presented in *Champlin Oil & Refining Company v. Chastain*, 403 S.W.2d 376, 389–90 (Tex.1965), which involved gas pricing formulas and a history similar to the present case.

In *Champlin*, which the Court characterized as an "accounting suit," *id.* at 384, the seller of the gas sought to recover for gas delivered and processed under a contract which provided for monthly payments. The Court held the seller's claims were subject to the former four-year statute of limitations, and that the seller was limited to recovery, if at all, to the gas delivered within four years prior to the commencement of the action.

Now however, a contract for the sale of oil or gas is a contract for the sale of goods, and

is therefore covered by Chapter 2 of Texas Business and Commerce Code Annotated (Vernon 1994 & Supp.1998). *Howell Crude Oil v. Tana Oil & Gas*, 860 S.W.2d 634, 637 (Tex.App.—Corpus Christi 1993, no writ). Because, as explained in our discussion of Panhandle's venue cross-point, we hold that sellers were not parties to the Edwards contract, Panhandle's contention that Article VII.5 of the Edwards contract reduced the limitations period from four years to two, does not apply to sellers, even if otherwise applicable to Edwards.[6] As to gas sales made after May 1, 1998, we sustain sellers fourth point of error because they are not barred by the statute of limitations.[7]

■ Moreover, by sub-point two of reply-point one, Panhandle contends that $1.65 per Mcf under the 1987 agreement became the "price in effect" under the Edwards contract upon deregulation, and that it paid in accordance with the "price in effect" provision. However, even assuming the 1987 price reduction was binding on the sellers, a question which we do not decide, for the same reasons expressed in our discussion of Panhandle's venue cross-point, the "price in effect" provision of the Edwards contract is not controlling as to sellers.[8] Further, Panhandle did not meet its summary judgment burden to show the agreed price for gas sold after May 1, 1988. The June 12, 1987 letter of attorney Scott to Panhandle stated that 70% of the sellers desired to sell the gas at $1.65 per Mcf for one year. By its letter of April 29, 1988, Panhandle acknowledged that some of the sellers had approved the Panhandle letter of April 13, 1987, which did not contain a one-year limitation · on the $1.65 price, but that others had approved the $1.65 price for only one year by other documentation. Also, the April 29, 1988 letter from Panhandle advised the sellers that effective May 1, 1988, Panhandle would continue to remit to the operator based upon a price of $1.65 per Mcf. However, Panhandle did not provide any summary judgment evidence that all sellers

agreed to $1.65 following its letter of April 29, 1988, and Panhandle did not raise estoppel as grounds for summary judgment.

Determination of the agreed price effective May 1, 1988 is further confused by the history of American Star's claim. Upon Edwards's first partial assignment of the working interest, he retained an overriding interest and a "back in" interest in the leasehold, which he assigned to Burnaby on January 12, 1988. After Burnaby acquired this interest, it signed a new contract with Panhandle dated November 1, 1988, but effective January 5, 1988, which among other things set a price of $1.65 per Mcf. The November 1, 1988 contract also provided that all prior agreements, including the Edwards contract, were superseded and replaced by the November 1, 1988 contract.

By assignment dated July 12, 1990, Burnaby assigned its rights to American Star. The assignment provided in part that it was subject to "other **burdens** upon the assigned oil and gas leasehold interest." (Emphasis added). In addition, American Star, by its letter of November 1, 1987, had previously acknowledged that it was aware that problems regarding the Edwards contract were unsettled, and American Star did not contend that it was a bona fide purchaser without notice of the November 1, 1988 contract. Similarly, Panhandle's motion did not contend that American Star was bound to a price of $1.65 per Mcf under the November 1, 1988 contract between Burnaby and Panhandle.

Taking all evidence favorable to sellers as true, indulging every reasonable inference, and resolving all reasonable doubt in sellers' favor, *MMP, Ltd. v. Jones*, 710 S.W.2d at 60, the trial court erred in granting summary judgment in favor of Panhandle because Panhandle failed to establish the agreed price for the gas sold after May 1, 1988. Moreover, Panhandle was not entitled to summary judgment on the basis of the two-year limitations provision, or the "price in effect" provision of

6. Before Burnaby assigned its interest to American Star, Burnaby and Panhandle made a new contract replacing the Edwards contract.

7. Because some sellers joined this suit after it was filed by the Russell Group, the four year

period prior to the filing of suit will not be uniform for all involved.

8. See *infra,* footnote six.

the Edwards contract because sellers were not privy to the Edwards contract. Finally, Panhandle failed to establish that sellers claims for underpayment during the four years immediately preceding the filing of suit were barred by limitations. Accordingly, we sustain sellers' first and fourth points of error only to the extent that they apply to sellers' claims for gas delivered and sold after May 1, 1988.

## VENUE

■ Because our partial sustention of sellers' first and fourth points of error mandates a reversal and remand, we now consider Panhandle's conditional cross-point that the trial court erred in denying its motion to transfer venue. In response to the cross-point, sellers' contention is two-fold. First, they contend that venue was proper in Potter County because it is the county where Edwards and Panhandle consummated the Edwards contract and, therefore, all or part of the sellers' cause of action arose in Potter County. See Tex. Civ. Prac. & Rem.Code Ann. §§ 15.001 & 15.037 (Vernon 1986).[9] Second, and without citing any caselaw, they contend that because they filed a notice of limited appeal under former Texas Rule of Appellate Procedure 40(a)(4), and because Panhandle did not perfect its own appeal by filing its own cost bond, that Panhandle is prohibited from raising the venue issue on appeal.

Because this appeal was perfected before September 1, 1997, appellants are correct in their assertion that Panhandle's cross-point is controlled by the Texas Rules of Appellate Procedure as they existed before September 1, 1997. However, we disagree with their construction and application of former Texas Rule of Appellate Procedure 40(a)(4), which provides:

"**Notice of Limitation of Appeal.** No attempt to limit the scope of an appeal

shall be effective unless the severable portion of the **judgment** from which the appeal is taken is designated in a notice served on all other parties to the trial court's **final judgment** within fifteen days after judgment is signed...." (Emphasis added).

Because here, the October 14, 1992 order denying the motion to transfer venue is not a judgment, but is instead a separate ruling, Panhandle properly raised it by cross-point under former Texas Rule of Appellate Procedure 74(e), and is not precluded from presenting the cross-point under former Rule 40(a)(4).[10] *Donwerth v. Preston II Chrysler–Dodge*, 775 S.W.2d 634, 638 (Tex.1989). The venue issue is therefore properly before this Court.

## STANDARD OF REVIEW

■ The standard of review of a trial court's venue determination is governed by Section 15.064(b) of Texas Civil Practice and Remedies Code Annotated (Vernon 1986). According to the statute, if venue was improper, the error cannot be harmless. In determining whether venue was improper, we must consider the entire record. If there is any probative evidence in the record indicating that venue was proper in the county where judgment was rendered, we must uphold the trial court's determination, even if the preponderance of the evidence is to the contrary. *Ruiz v. Conoco*, Inc., 868 S.W.2d 752, 758 (Tex.1993). If there is no evidence to support the venue determination, the judgment must be reversed and the cause remanded to the trial court. *Id.* If there is any probative evidence that venue was proper in the county to which transfer was sought, we should instruct the trial court to transfer the case to that county. *Id.*

■ Although venue may have been proper in Hutchinson County, because the Bearkiller lease was located there,[11] sellers

---

9. Section 15.037 was repealed by Act of May 4, 1995, 74th Leg., R.S., ch. 138, § 10, 1995 Tex. Gen. Laws 978, 981.

10. We note that Texas Rule of Appellate Procedure 25.1(c), effective September 1, 1997, provides that a party desiring to appeal "the trial court's judgment or **other appealable order** must

file a notice of appeal." (Emphasis added). However, because this appeal was perfected prior to September 1, 1997, the current rule is not applicable.

11. Tex. Nat. Res.Code Ann. § 91.404(c) (Vernon 1993).

commenced this action in Potter County. Sellers sought to recover for the sales of gas at prices fixed by the Edwards contract, even though they were not parties to the contract and the contract provided that Panhandle's payments were to be made to Edwards in Dallas. Sellers generally alleged that they were the "successors-in-interest" to Edwards but they did not allege facts supporting the allegation, or that Edwards made the contract for their benefit. After Panhandle filed its motion to transfer venue, the sellers responded, contending then as they do now, that because the Edwards contract was executed in Potter County, all or part of their cause of action arose in Potter County and that venue was proper under sections 15.001 and 15.037 of Texas Civil Practice and Remedies Code Annotated (Vernon 1986).

By its conditional cross-point, Panhandle contends, citing section 15.037, that the case should have been transferred to Bexar County. Panhandle argues that venue in Potter County was improper because (1) as to the sellers, the Edwards contract was not made in Potter County; (2) the sellers were not parties to the Edwards contract when it was executed; (3) Edwards is not a party to this suit; (4) sellers presented no evidence of the place of their ratifications of the contract; (5) sellers presented no evidence that Edwards was acting as their agent when he executed the contract; and (6) no portion of sellers' claims for gas produced in Hutchinson County accrued in Potter County. We sustain Panhandle's conditional cross-point, thereby reversing the trial court's denial of Panhandle's motion to transfer venue.

The sole basis for venue in Potter County is sellers' contention that because the Edwards contract was consummated in Potter County, that part or all of sellers' cause of action arose there. *See* Tex. Civ. Prac. & Rem. Ann.Code §§ 15.001 & 15.037 (Vernon 1986). Even though sellers do not assert that they were parties, or third-party beneficiaries to the Edwards contract, they nevertheless contend, without citing any authority, that part of their cause of action was founded upon the Edwards contract.

With narrow exception, privity is essential to maintaining an action on a contract. *See Camco Oil Corporation v. Vander Laan,* 220 F.2d 897, 898 (5th Cir.1955) (where an original assignor of one-half of the working interest in a lease could not recover drilling costs from a subsequent assignee claiming under the original assignee, even though the original assignee had agreed to pay one-half of the drilling costs, because there was no privity of contract between the original assignor and the subsequent assignee). *See also C & C Partners v. Sun Exploration & Prod.,* 783 S.W.2d 707, 721 (Tex. App.—Dallas 1989, writ denied), *disapproved on other grounds,* 960 S.W.2d 41, 47 (Tex. 1998). The fact that the subsequent assignee may have been in this context "a successor in interest" to the original assignee, did not render the subsequent assignee obligated on the agreement of its predecessor, who was the original assignee. Further, because the law presumes that Edwards and Panhandle contracted for themselves, *Corpus Christi Bank and Trust v. Smith,* 525 S.W.2d 501, 503 (Tex.1975), and because we must presume that Edwards and Panhandle contracted only for themselves and not for the benefit of third parties where, as here, it appears that such was their intention, *Bush v. Brunswick Corp.,* 783 S.W.2d 724, 727–28 (Tex. App.—Fort Worth 1989, writ denied), the fact that Edwards and Panhandle made the agreement in Potter County does not inure to the benefit of sellers for venue purposes.

Moreover, the order denying Panhandle's motion to transfer venue cannot be supported by the Edwards's assignment of the oil and gas leases to sellers. First, neither sellers' pleadings, nor their venue response alleged that they acquired rights in the Edwards contract by express assignment. However, even if such a contention was raised by implication, venue cannot be supported on this ground because, without referencing the contract, Edwards's assignment of the oil and gas lease was not effective to assign the Edwards contract. *OTC Petroleum v. Brock Exploration,* 835 S.W.2d 792 (Tex.App.—Amarillo 1992, writ denied).[12]

---

**12.** Likewise, the Edwards contract was not effec-

tive to transfer an interest in the oil and gas

Also, because the Edwards contract granted Panhandle a right-of-way over the lease and contemplated the sale of goods far in excess of $500.00, both section 5.021 of Texas Property Code Annotated (Vernon 1984) and section 2.201(a) of Texas Business & Commerce Code Annotated (Vernon 1994) require that it be in writing and signed by the parties to be bound.

■ An assignment is a contract between the assignor and assignee and operates by way of an agreement. *University of Tex. Med. Branch v. Allan*, 777 S.W.2d 450, 453 (Tex.App.—Houston [14th Dist.] 1989, no writ). In its most general sense, it means a transfer or setting over of some property or right from one person to another. *Id.* at 452. There being no evidence of assignment of the Edwards contract, as distinguished from the assignment of the oil and gas lease, venue in Potter County cannot be supported on the basis of assignment.

Finally, we note that section 2.103(4) of Texas Business and Commerce Code Annotated (Vernon 1994) defines "seller" to include (a) persons who sell or, (b) persons who contract to sell goods. In this context, Edwards is the person who contracted in Potter County to sell goods (gas) produced in Hutchinson County. Although some of the sellers and Panhandle made an agreement for the sale of gas in 1987, there is no evidence the 1987 agreement was made in Potter County, nor is there any evidence the 1988 Burnaby contract was made in Potter County.

Sellers never contracted in Potter County, but they did sell goods (gas) produced in Hutchinson County. In *Bruner v. Exxon Co., U.S.A.*, 752 S.W.2d 679, 683 (Tex.App.—Dallas 1988, writ denied), it was held that an assignee of rentals of a lease did not have a cause of action for wrongful termination of the lease. In *Accent Energy Corp. v. Gillman*, 824 S.W.2d 274, 278 (Tex.App.—Amarillo 1992, writ denied), we held that because the plaintiffs did not sustain their burden

under section 15.001 of Texas Civil Practice and Remedies Code Annotated (Vernon 1986), to show that any part of their alleged cause of action for unfair usurpation of a corporate opportunity occurred in Hutchinson County, that a severance and transfer to Dallas County of the severed claim was required.

Sellers' cause of action for the sale of gas did not arise out of the Edwards contract. Rather, it arose by reason of sellers' sales of gas produced and delivered in Hutchinson County. *Shamrock Oil and Gas Corporation v. Price*, 364 S.W.2d 260, 262 (Tex.Civ. App.—Amarillo 1963, no writ). We, therefore, sustain Panhandle's cross-point. Because there is some evidence to indicate that Panhandle's principal office is situated in Bexar County, venue is proper there.

·Having concluded that the judgment of the trial court must be reversed and the cause remanded, we do not address the remaining issues for such would amount to an advisory opinion.[13] *Maranatha Temple v. Enterprise Products*, 833 S.W.2d 736, 742 (Tex.App.—Houston [1st Dist.] 1992, writ denied). Accordingly, we reverse the judgment and remand the cause to the trial court with instructions to transfer it to a district court in Bexar County.    .

---

before production. Tex. Bus. & Com.Code Ann. § 2.107 (Vernon 1994).

**13.** We do not determine whether any, some, or all sellers are, or are not, bound by the 1985 and 1987 price reductions, or if so, the effect of such

determinations. Nor do we determine any claims or defenses based upon the Edwards contract as they may be finally cast upon trial on the merits.